**Yolanda Candelario RAMOS, et al., Plaintiffs,**

v.

**BAXTER HEALTHCARE CORPORATION OF PUERTO RICO, INC., et al., Defendants.**

**No. CIV. 98–2146(RLA).**

United States District Court, D. Puerto Rico.

April 2, 2003.

Luis A. Suarez–Zayas, Esq., San Juan, Charles S. Hey–Maestre, Esq., Río Piedras, for Plaintiff or Petitioner.

Pedro J. Manzano–Yates, Esq., Fiddler, Gonzalez & Rodriguez, San Juan, Jeffrey K. Ross, Esq., Christopher A. Weales, Esq., Charles C. Jackson, Esq., Seyfarth, Shaw, Fairweather & Geraldson, Chicago, IL, for Defendant or Respondent.

### *ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT*

ACOSTA, District Judge.

## TABLE OF CONTENTS

I. UNCONTESTED FACTS ...............................................131

II. THE COMPLAINT .......................................133

III. SUMMARY JUDGMENT STANDARD ....................................133

IV. TITLE VII ......................................................134
 A. DISPARATE TREATMENT ............................................134
 1. Prima Facie Case ...................................................136
 2. Legitimate Non–Discriminatory Reason/Pretext.........................136
 3. Economic Reasons ...............................................137
 a. Benefits Prior to 1990........................................137
 (1) Discrimination Testing....................................138
 (2) Time to Implement and Communicate .........................139
 (3) Competitiveness ..........................................139
 b. Studies...................................................140
 (1) 1993 Study .............................................140
 (2) 1995 study .............................................142
 c. Carolina Plant Closing ......................................143
 4. Tradeoffs ......................................................144
 5. Perception Second–Class Status......................................144
 6. Queipo Report/Nevin Affidavit ....................................144
 7. Conclusion .....................................................145
 B. DISPARATE IMPACT...............................................145

V. ERISA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

VI. P.R. CIVIL CODE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 149

VII. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 150

Defendants have moved the court to enter summary judgment in their favor and to dismiss plaintiffs' claims of alleged national origin discrimination as well as those asserting breach of fiduciary duties under ERISA and under the Puerto Rico Civil Code.

## I. *UNCONTESTED FACTS*

The court finds that the following facts, material to the issues presented in the outstanding summary judgment request, are uncontested.

BAXTER INTERNATIONAL, INC. ("BAXTER") is a U.S. Corporation which manufactures and distributes health care products on a global basis. BAXTER has subsidiaries and facilities in the United States as well as around the world. Including its subsidiaries, BAXTER employs approximately 45,000 employees worldwide.

One of BAXTER's subsidiaries, through intermediate corporations, is BAXTER–PR. BAXTER P.R. transacts businesses in Puerto Rico and is the employer of most of BAXTER's approximately 6,000 employees in Puerto Rico.

BAXTER and its subsidiaries provide their employees an opportunity to participate in certain defined benefit pension plans.

The **Domestic Plan** is the primary domestic defined benefit plan and covers the employees of many, but not all, BAXTER subsidiaries in the continental United States.[1]

BAXTER–PR is one of the BAXTER subsidiaries which has not adopted the **Domestic Plan**. Instead, BAXTER–PR has a comparable defined benefit pension plan for its employees, i.e., the **Puerto Rico Plan**. The **Puerto Rico Plan**, like the **Domestic Plan**, provides benefits for employees who retire early.

BAXTER and its subsidiaries in the United States and around the world provide different compensation and benefit programs to their employees. However, only the **Domestic** and **Puerto Rico Plans** are subject to ERISA.

The **Puerto Rico Plan** and its predecessors historically have had different provision formulas and employee "payouts" than the Domestic Plan.

In **1987** the Puerto Rico Plan was modified so as to match the **Domestic Plan** general retirement "payout".

As of **1987** both the **Domestic** and **Puerto Rico Plans** had the same formula and level of pension benefits for participating employees as well as the same early retirement provisions.

In **1990** the **Domestic Plan** early retirement formula changed to a point system ("ER/PS") but the **Puerto Rico Plan** did not. Instead, the early retirement benefit formula in the **Puerto Rico Plan** has remained the same as the **pre–1990 Domestic Plan.**

---

1. Among other subsidiaries excluded from the **Domestic Plan** are: Perfusion Services of Baxter Healthcare Corporation, Nextran, the hourly employees of American Cytoscope Makers Division, the hourly employees of the Medi–Vac facility in Jacksonville, Texas and the former Airlife facility in Montclair, California.

The **Domestic Plan,** like many ERISA pension plans, has an early retirement provision for employees retiring before age 65.

The formula for calculating early retirement benefits applicable to the **Puerto Rico Plan** as well as to the **pre–1990 Domestic Plan** operated as follows. An employee with ten years of service who retired between age 55 and 65 received a subsidized early retirement pension benefit, reduced at the rate of 3% of normal benefits for each year of retirement before age 65. Accordingly, an employee retiring at age 55 received 70% of his or her normal retirement benefit (3% per year × 10 years = 30% reduction). If an employee left before age 55 (with ten years of service), there was a severe reduction, or "cliff", in early retirement benefits to 29% of the normal retirement benefit—the actuarial equivalent of full benefits without any subsidy. Even then, an employee retiring before age 55 had to wait until age 55 to even begin receiving the 29% actuarial equivalent. This cliff discouraged employees from leaving before age 55.

Pursuant to the ER/PS implemented in 1990 the method by which early retirement pension benefits were calculated in the **Domestic Plan** was determined based on the total of the employee's age and years of credited service. Normally, if an employee retires before age 55, the monthly benefit is reduced on an actuarial basis to reflect the fact that the benefit will be paid out over a longer period of time. Under the ER/PS, an employee receives a subsidized benefit based upon the number of points (age plus years of credited service) accumulated. The early retirement subsidy increases with the number of points, thus, an employee retiring at age 55 with 65 points would receive 29% of the full retirement benefit, while an employee retiring at age 55 with 85 points would receive 100% of the retirement benefit.

The primary reason for the change to the point system was to neutralize early retirement pension benefits as a factor in an employee's retirement decision-making. BAXTER, at that time, was considering a number of workforce reductions. By removing the previous cliff for employees retiring before age 55, BAXTER allowed long-term employees to retire before age 55 when they wanted to, rather than forcing them to keep working in order to earn the subsidized retirement benefits.

Ever since the **Domestic Plan** adopted a point system formula for determining early retirement benefits in **1990**, local BAXTER management in Puerto Rico has made a series of proposals to change the **Puerto Rico Plan** formula to a point system. These proposals were but one part of regular proposals to change and/or increase many different types of benefits. BAXTER has continually decided not to adopt the point system in Puerto Rico.

In **1998** BAXTER decided to implement a defined contribution pension plan in Puerto Rico.

In **October 1995** BAXTER announced the closing of the Carolina plant, one of its largest plants in Puerto Rico, because it had excess production capacity in Puerto Rico and needed to reduce costs and improve competitiveness. The closing was conducted in stages over several years beginning in **January 1996** and ending in **December 1998.**

During this time, a number of the employees at the Carolina facility sought to enhance their early retirement benefits under the Puerto Rico Plan by writing to BAXTER urging it to change to a point system.

On **February 11, 1997** BAXTER sent a letter to certain of these BAXTER–PR

employees under the signature of MIKE TUCKER, Senior Vice President of Human Resources, explaining the reasons why the proposal to change the **Puerto Rico Plan** to a point system had been rejected.

## II. *THE COMPLAINT*

A number of BAXTER–PR employees who worked at the Carolina plant filed the instant suit alleging national origin discrimination and breach of fiduciary duties as a result of BAXTER's decision, since 1990, not to institute a point system in the early retirement provision of the **Puerto Rico Plan**, as was done in the **Domestic Plan**.

The suit also makes the same legal claims concerning the parallel, subsidized retiree health and life insurance benefits that apply to employees covered by the **Domestic Plan**, but do not apply to employees covered by the **Puerto Rico Plan**. Since both claims involve the same basic issues and in order to avoid confusion we shall address the ER/PS arguments only bearing in mind the result will apply to the health and life benefits claims as well.

## III. *SUMMARY JUDGMENT STANDARD*

Rule 56(c) of the Federal Rules of Civil Procedure sets forth the standard for ruling on summary judgment motions providing that "[t]he judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *See, Sands v. Ridefilm Corp.*, 212 F.3d 657, 660–61 (1st Cir.2000). The party seeking summary judgment must first demonstrate the absence of a genuine issue of material fact in the rec-

ord. *DeNovellis v. Shalala*, 124 F.3d 298, 306 (1st Cir.1997). A genuine issue exists if there is sufficient evidence supporting the claimed factual disputes to require a trial since a reasonable factfinder could resolve the issue in favor of either party. *Rogan v. City of Boston*, 267 F.3d 24, 27 (1st cir.2001); *Morris v. Gov't Dev. Bank of Puerto Rico*, 27 F.3d 746, 748 (1st Cir. 1994); *LeBlanc v. Great Am. Ins. Co.*, 6 F.3d 836, 841 (1st Cir.1993), *cert. denied*, 511 U.S. 1018, 114 S.Ct. 1398, 128 L.Ed.2d 72 (1994).

However, not all genuine issues of fact mandate trial. Only those facts that "ha[ve] the potential to change the outcome of the suit under governing law if found favorably to the nonmovant" qualify as "material" for purposes of the rule. *Martinez v. Colon*, 54 F.3d 980, 984 (1st Cir.) *cert. den.*, 516 U.S. 987, 116 S.Ct. 515, 133 L.Ed.2d 423 (1995). *See also, Rogan*, 267 F.3d at 27; *Morrissey v. Boston Five Cents Sav. Bank*, 54 F.3d 27, 31 (1st Cir. 1995).

Summary judgment has been held appropriate "[e]ven in employment discrimination cases where elusive concepts such as motive or intent are at issue... if the non-moving party rests merely upon conclusory allegations, improbable inferences, and unsupported speculation." *Feliciano v. El Conquistador*, 218 F.3d 1, 5 (1st Cir.2000) (citing *Medina–Muñoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir.1990)) (internal quotations omitted); *Santiago–Ramos v. Centennial P.R. Wireless, Corp.*, 217 F.3d 46, 56 (1st Cir.2000); *Carmona Rios v. Aramark Corp.*, 139 F.Supp.2d 210, 214 (D.P.R.2001).

In cases where the non-movant party bears the ultimate burden of proof, he must present definite and competent evidence to rebut a motion for summary judgment, *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256–257, 106 S.Ct. 2505, 91

L.Ed.2d 202 (1986); *Navarro v. Pfizer Corp.*, 261 F.3d 90, 94 (1st Cir.2001); *Grant's Dairy v. Comm'r of Maine Dep't of Agric.*, 232 F.3d 8, 14 (1st Cir.2000).

In ruling on summary judgment petitions the court will examine the evidence in the light most favorable to the opposing party drawing all inferences in its favor. *Feliciano v. El Conquistador*, 218 F.3d at 5; *Mulero–Rodriguez v. Ponte, Inc.*, 98 F.3d 670, 672 (1st Cir.1996).

## IV. *TITLE VII*

In challenging BAXTER's decision not to implement the early retirement point system in Puerto Rico plaintiffs have asserted discrimination claims under both disparate treatment and disparate impact theories.

■ Art. 703 of Title VII of the 1964 Civil Rights Act, as amended, makes it unlawful for an employer to "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment because of such individual's race... or national origin". 42 U.S.C. § 2000e–2(a)(1). This discrimination provision extends to fringe benefits afforded employees such as retirement plans. *Arizona Governing Comm. v. Norris*, 463 U.S. 1073, 103 S.Ct. 3492, 77 L.Ed.2d 1236 (1983).

## A. DISPARATE TREATMENT

Absent direct evidence of discrimination plaintiffs must follow the burden-shifting framework established in *McDonnell Douglas v. Green*, 411 U.S. 792, 802–5, 93 S.Ct. 1817, 1824–26, 36 L.Ed.2d 668, 677–79 (1973). *Rivera–Rodriguez v. Frito Lay Snacks Caribbean*, 265 F.3d 15, 25 (1st Cir.2001); *Feliciano v. El Conquistador*, 218 F.3d at 5.

Under the *McDonnell Douglas* paradigm plaintiff carries the initial burden of establishing discrimination based on national origin by presenting evidence sufficient to constitute a prima facie case of discrimination. "As in other types of disparate treatment cases an employee establishes a prima facie case of benefit discrimination by following the *McDonnell Douglas* framework and showing that he or she is a member of a protected group, was eligible to receive a benefit, was denied a benefit, and non-protected group members received the benefit." 1 Lex K. Larson, Employment Discrimination § 14.01, pp. 14–2 to 14–3 (2d Ed.1994).

Thus, plaintiffs must submit evidence that "other similarly situated employees who were not members of the protected class were treated more favorably." *Rivera–Rodriguez v. Frito Lay*, 265 F.3d at 25; *Rivas v. Radio Shack, Inc.*, 312 F.3d 532, 534 (1st Cir.2002). *See also, Trans World Airlines, Inc. v. Hardison*, 432 U.S. 63, 71, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977) ("[S]imilarly situated employees are not to be treated differently solely because they differ with respect to race, color, religion, sex, or national origin."); *Conward v. Cambridge Sch. Comm.*, 171 F.3d 12, 20–22 (1st Cir.1999) (plaintiff must show that others similarly situated to him "in all relevant respects" were treated differently by the employer); *Perkins v. Brigham & Women's Hosp.*, 78 F.3d 747, 751 (1st Cir. 1996) (plaintiff must "demonstrate that the cases are 'fair congeners'"); *Bush v. Commonwealth Edison Co.*, 990 F.2d 928, 931 (7th Cir.1993) *cert. den.*, 511 U.S. 1071, 114 S.Ct. 1648, 128 L.Ed.2d 367 (1994) (no prima facie disparate treatment case where non-protected class comparators treated both better and worse than plaintiffs).

Once plaintiff has complied with this initial step the defendant must "articulate a legitimate nondiscriminatory reason" for the challenged conduct at which time pre-

sumption of discrimination fades. The burden then falls back on plaintiff who must then demonstrate that the proffered reason was a "pretext" and that the decision at issue was instead motivated by discriminatory animus. *See, Gu v. Boston Police Dept.*, 312 F.3d 6, 11 (1st Cir.2002); *Gonzalez v. El Dia, Inc.*, 304 F.3d 63, 69 (1st Cir.2002); *Zapata–Matos v. Reckitt & Colman, Inc.*, 277 F.3d 40, 44–45 (1st Cir. 2002); *Feliciano v. El Conquistador*, 218 F.3d at 5; *Santiago–Ramos v. Centennial P.R. Wireless Corp.*, 217 F.3d 46, 54 (1st Cir.2000). "At this third step in the burden-shifting analysis, the *McDonnell Douglas* framework falls by the wayside because the plaintiff's burden of producing evidence to rebut the employer's stated reason for its employment action merges with the ultimate burden of persuading the court that she has been the victim of intentional discrimination." *Feliciano v. El Conquistador*, 218 F.3d at 6 (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 256, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)) (internal citations and quotation marks omitted).

Defendant's "burden is one of production, not persuasion" *Reeves v. Sanderson Plumbing Prod., Inc.*, 530 U.S. 133, 142, 120 S.Ct. 2097, 147 L.Ed.2d 105 (2000) and "[a]t all times, the plaintiff bears the 'ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff.'" *Gu v. Boston Police Dept.*, 312 F.3d at 11 (citing *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. at 253, 101 S.Ct. 1089). *See also, Reeves*, 530 U.S. at 143, 120 S.Ct. 2097.

■ Title VII "does not ensure against inaccuracy by an employer, only against... discrimination." *Rivas Rosado*, 312 F.3d at 535. "Federal courts do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers [Title VII] does not interfere." *Gonzalez v. El Dia, Inc.*, 304 at 69 (citation and internal quotation marks omitted); *Rodriguez–Cuervos v. Wal–Mart Stores, Inc.*, 181 F.3d 15, 20 (1st Cir.1999) (courts may not act as super personnel departments reviewing the "merits", "rationality" or accuracy of the defendant's determinations).

The fact that the reasons proffered by the employer are discredited by plaintiff does not automatically mandate a finding of discrimination. "That is because the ultimate question is not whether the explanation was false, but whether discrimination was the **cause** of the [conduct at issue]. We have adhered to a case by case weighing. Nonetheless, disbelief of the reason may, along with the prima facie case, on appropriate facts, permit the trier of fact to conclude the employer had discriminated." *Zapata*, 277 F.3d at 45 (citations omitted) (emphasis ours); *Reeves*, 530 U.S. at 147–48, 120 S.Ct. 2097.

In a summary judgment context the court must determine "whether plaintiff has produced sufficient evidence that he was discriminated against due to his national origin to raise a genuine issue of material fact." *Zapata*, 277 F.3d at 45; *Rivas Rosado*, 312 F.3d at 534.

■ Thus, in Title VII cases summary judgment petitions will be denied if once the court has reviewed the evidence submitted by the parties in the light most favorable to the plaintiff it finds there is sufficient evidence from which a trier of fact could conclude that the reasons adduced for the charged conduct are pretextual and that the true motive was discriminatory. *Santiago–Ramos v. Centennial*, 217 F.3d at 57; *Rodriguez–Cuervos*, 181 F.3d at 20.

### 1. Prima Facie Case

BAXTER initially argues plaintiffs' prima facie burden fails because they have not shown that they were treated differently than similarly-situated BAXTER employees not of Puerto Rican origin. In support of this argument defendant contends that plaintiffs compare themselves to only a segment of other BAXTER employees, i.e., those covered by the **Domestic Plan** whereas other facilities located in the United States are also excluded from such Plan and likewise do not benefit from the ER/PS.

According to BAXTER the **Domestic Plan** covers many but not all of the employees of its subsidiaries in the continental United States.[2] Inasmuch as for purposes of this Order we will assume that plaintiffs have met their prima facie burden we need not delve into whether or not the discrepancy between the number of stateside employees excluded from the ER/PS is significant enough to defeat plaintiffs' initial step in the *McDonnell Douglas* analysis.

Defendant further denies discrimination arguing that eligibility for ER/PS benefits is not contingent on national origin but rather on whether an employee works for a subsidiary covered by a **Domestic Plan.** However, because we are dealing with BAXTER's determination not to extend benefits to a particular group of employees the issue is not whether there are any discriminatory effects in the application of a particular plan. Rather, the controversy centers on whether the reasons behind this decision were discriminatory.

### 2. Legitimate Non–Discriminatory Reasons/Pretext

■ Assuming, *arguendo*, that plaintiffs have met their initial burden of presenting a prima facie case of discrimination based on national origin, i.e., that they are Puerto Ricans eligible for the early retirement point system, which benefits were denied to them but extended to non-Puerto Rican employees, we must then examine whether BAXTER has articulated legitimate, non-discriminatory reasons for not adopting the ER/PS for the **Puerto Rico Plan.**

BAXTER avers its decision not to extend the ER/PS benefits to the Puerto Rico Plan responded to economic factors. Further, it claims that the pension benefits provided to plaintiffs herein were comparable or better than those offered by similar industries operating locally. Plaintiffs, on the other hand, contend these justifications are pretextual and that BAXTER's refusal to include the ER/PS in the **Puerto Rico Plan** was motivated instead by its discriminatory animus against Puerto Ricans.

For easier reading plaintiffs' arguments regarding pretext shall be addressed concurrently with the explanations proffered by BAXTER.

■ It is important to note initially that Title VII does not require that all employees receive the same salaries and benefits regardless of location. Variances are authorized so long as they are not premised on impermissible factors. Thus, the statute allows for employers to "apply different standards of compensation, or different terms, conditions, or privileges of employment... to employees who work in different locations, provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin" 42 U.S.C. § 2000e–2(h).

According to MARY BARKER, former Vice–President for Benefit Management of BAXTER INTERNATIONAL, BAXTER

---

2. A list of the particular subsidiaries appears at n.1 *ante.*

provides different compensation and benefit programs to their employees without any effort to match them "either in the U.S., or globally" and its determination is a "function of cost and competitive market conditions." BARKER Aff. ¶ 2. Puerto Rico is no exception. MS. BARKER further stated that the compensation package and benefits offered to BAXTER employees in Puerto Rico, "is tied to the [local] business environment and competitive market conditions" which, in some situations may work to their advantage but not always. BARKER Aff. ¶ 2 & 3; and affidavit of ROBERTO PEREZ,[3] ¶ 3. "Some benefits are better in Puerto Rico, and some are better at other locations." PEREZ Aff. ¶ 4. For instance, MS. BARKER pointed out that "as compared with many other Baxter locations in the U.S., Baxter–PR provides enhanced benefits including medical insurance (earlier eligibility and more generous co-pay and 'out-of-pocket' rules); education program (higher reimbursement rate); life insurance (two times base pay versus one time base pay in the U.S.) and a Christmas bonus (2% of pay). In addition, several Baxter–PR plants provide a greater number of vacation days than Baxter locations in the U.S." BARKER Aff. ¶ 3

### 3. Economic Reasons

In its motion for summary judgment BAXTER essentially advanced two reasons in support of its decision not to adopt the ER/PS for the **Puerto Rico Plan.** It believed that: (1) it could not afford to provide the enhanced benefits, and (2) it did not need to provide the benefits to be competitive with other similar employers in Puerto Rico.

BAXTER's refusal to extend the ER/PS to the **Puerto Rico Plan** was not a one-time decision. Improvements to the terms of the Puerto Rico pension plan was a recurrent issue that was periodically considered by BAXTER's senior management throughout a period of several years. Therefore, this determination must be examined in the context of the sequence of events commencing in **1989** when the change of benefits was initially entertained; implementation of the ER/PS in the **Domestic Plan in 1990,** and senior management's **1993** and **1995** subsequent determinations not to adopt the ER/PS for Puerto Rico.

### a) Benefits Prior to 1990

Except for a three-year period, i.e., **1987–1990,** the benefits afforded the BAXTER–PR employees have differed from those offered to stateside employees. To this effect GREGORY HANSEN points out in his affidavit that "[t]he Puerto Rico Plan and its predecessors historically have had different provisions, formulas and em-

---

**3.** In his affidavit subscribed on January 22, 2000 MR. PEREZ summarized his experience with BAXTER as follows:

Until the beginning of this year, I was the President of Baxter International Inc.'s (Baxter) Fenwal division. In this position, I was ultimately responsible for the division's operations worldwide, including Fenwal's Puerto Rico operations. I worked for Baxter for over twenty-five years. Prior to 1985, I was in charge of Baxter's manufacturing operations in Puerto Rico. From July 1985 to June 1992, I was Vice–President of Baxter's Fenwal division with particular responsibility for the division's manufacturing

plants in Puerto Rico. In June 1992, I became President of the Fenwal division. In March 1994, I was appointed Corporate Vice President of Manufacturing, and, as head of the Corporate Manufacturing Council, was responsible for coordinating corporate manufacturing strategy with the general managers of all Baxter units in Puerto Rico. In November 1995, I became President, Global Operations of Baxter's Renal Division. In June, 1997, I again assumed the position of President of the Fenwal division.

PEREZ Aff. ¶ 1.

ployee payouts than the Domestic Plan. In 1987, however, the Puerto Rico Plan was greatly enriched so as to match the domestic Plan general retirement payout." HANSEN Aff. ¶ 4.

According to the documentary evidence on record the initial discussions regarding extending the proposed amendments to Puerto Rico employees centered on three subjects, i.e., (1) "discrimination testing", (2) need for additional time to "implement and communicate" any changes, and (3) conducting a study to assess the added costs to the pension plan.

The Minutes of the **June 28, 1989** Retirement System Administrative Task Force Meeting summarize the aforementioned points as follows:

PUERTO RICO PENSION: Greg Hansen commented on the effect of delaying changes to the Puerto Rico Pension Plan and what, if any, impact that approach may have on **discrimination testing** of the Plans.

Judy Coffey–Hedquist explained that, from a timing perspective, it would not be possible to **implement and communicate** changes to the Puerto Rico Plan by January 1, 1990.

Herb Walker pointed out that it would also be prudent to defer implementation so that **results** of several employee **surveys** on compensation and benefits currently distributed to Puerto Rico employees become available.

(emphasis ours)

### (1) *Discrimination Testing*

Plaintiffs argue the phrase "discrimination testing" used during this initial phase corroborates their allegations of national origin discriminatory animus. Plaintiffs reject HANSEN's explanation of the term within the actuarial field as "highly questionable" in the context of this case.

Plaintiffs' Motion and Memorandum in Opposition (docket No. 43) p.17 n4.

In his deposition MR. HANSEN explained that the term "discrimination" in the aforementioned process did not refer to the protections afforded by Title VII. Rather, it alludes to ERISA's provision that "contributions or benefits provided under the plan do not **discriminate in favor of highly compensated employees**". 26 U.S.C. § 401(a)(4). (emphasis ours).

It was MR. HANSEN, an actuary, who initially raised this matter at the Task Force meeting and actively pursued the topic always in the actuarial context of "discrimination testing of the plans". *See, i.e.,* **June 7, 1989** HANSEN memorandum re: Task force Meeting ("I [HANSEN] brought up the subject of the Puerto Rico plan and whether comperable [sic] changes will be made. We discussed discrimination issues briefly." (emphasis ours)) and **June 27, 1989** memorandum to file by HANSEN re: June 22, 1989 meeting ("We will check on whether the implementation of the plan can be delayed 6 months for Puerto Rico for **discrimination testing** purposes." (emphasis ours)).

Additionally, the December 5, 1990 Minutes of the Administrative Committee for the Baxter International Inc. Employee Benefits Plans specifically addressed the **"Discrimination Test"** in that same context and add further support to MR. HANSEN's version. In pertinent part the minutes read:

### II. **IIP Discrimination Test**
[D]istributed and reviewed the summary of the preliminary 1990 IIP **discrimination test** and related census data... [A]lso reviewed the results... of restructuring the IIP participants into various employee groups and **testing** the groups separately. Because the preliminary restructuring does not eliminate

the anticipated need to refund employee contributions, Ms. Wescott stated that her staff is attempting to restructure IIP participants by division, although preliminary results with this approach are not encouraging.

(emphasis ours)

Based on the foregoing, we see no grounds to discredit MR. HANSEN's version of the term to make it coincide with plaintiffs' national origin based discrimination.

### (2) *Time to Implement and Communicate*

Plaintiffs discard as pretextual BAXTER's allegations of the need for more time before deciding whether or not to implement the ER/PS benefits to Puerto Rico. Plaintiffs cite the alleged need for additional time to "translate" as exorbitant ergo pretextual by pointing to a **June 7, 1989** memorandum regarding a Task Force Meeting wherein HANSEN wrote: "Baxter thinks they might want to at least delay 6 months and maybe a year before the Puerto Rican plan is installed because there wouldn't be enough time to **translate and communicate** the information." (emphasis ours). However, the Minutes of the **June 28, 1989** Retirement System Administrative Task Force Meeting refer to **"implement and communicate"** instead and we see no reason to mistrust this version.

Further, according to the record additional considerations had to be taken into account by BAXTER in making this decision particularly its economic impact. Given the size of its local operations as well as the effects on its competitive posture the need for additional time to analyze this matter does not appear necessarily, if at all, consistent with being pretextual.

### (3) *Competitiveness*

Ever since **1989** BAXTER was consistently concerned with the added costs inherent in implementing the ER/PS to its Puerto Rico business. References to "competitiveness" [4] also emerge regularly. It appears recorded in the Minutes of a **December 5, 1990** Meeting of the Administrative Committee for the Baxter International Inc. Employee Benefit Plans which, in pertinent part reads as follows:

IX. *Puerto Rico*

. . . . .

Mr. Walker informed the Committee that there has been discussion in Puerto Rico relating to amending the Puerto Rico Pension Plan to include a 65–85 point system and offering a 401(k) plan, similar to the plans in the U.S. Mr. Walker said that an analysis of the **competitiveness** of the Company's plans in Puerto Rico will be made.

(emphasis ours).

Additionally, the **March 8, 1991** Minutes of Meeting of the Administrative Committee for the Baxter International Inc. Employee Benefit Plans indicate:

VI. *U.S./Puerto Rico Pension Plan*

Mr. Kunz distributed and reviewed the material... which summarizes the adverse effect on transferred Company employees who cease participation in either the U.S. or Puerto Rico pension plan and begin participation in the other as a result of the transfer.... Mr. Walker stated that a study of the **competitiveness** of the Company's Puerto

---

4. "Competitiveness" is given two different connotations in the documents submitted in this case. On the one hand it is used to compare the benefits provided by BAXTER– 

PR vis à vis those provided by similar employers in Puerto Rico. It is also used to denote a cost-competitive manufactured product.

Rico plans is underway to determine whether any plan changes should be considered. (Emphasis ours).

*See also,* **June 7, 1989** memorandum from HANSEN re: Task Force Meeting ("We are to (at our leisure) develop the cost to the pension plan of the new provisions. There is no retiree medical in Puerto Rico." (emphasis ours)); **June 29, 1989** memorandum from HANSEN re: Implementation Task Force Meeting (A **survey** is being conducted on compensation and benefits in Puerto Rico. It was decided not to extend the new early retirement or death benefit provisions to the Puerto Rico plan currently. (emphasis ours)); Minutes of **December 5, 1990** Meeting of the Administrative Committee for the Baxter International, Inc. Employee Benefit Plans ("Mr. Walker informed the Committee that there has been discussion in Puerto Rico relating to amending the Puerto Rico Pension Plan to include a 65–85 point system and offering a 401(k) plan, similar to the plans in the U.S. Mr. Walker said that an analysis of the **competitiveness** of the Company's plans in Puerto Rico will be made." (emphasis ours)).

Plaintiffs attempt to discredit this argument by alleging that none of the plaintiffs were aware of any surveys being conducted nor have any such results been provided by BAXTER. However, the fact that plaintiffs in this particular action did not personally know of any such surveys nor advised of the results is not indicative that none were carried out. Nor can we find that references to surveys were pretextual given BAXTER's repeated references to competitiveness and the related studies carried out in **1993** and **1995**.

### b) Studies

Plaintiffs point to the results of studies of BAXTER–PR compensation and benefits commissioned by BAXTER in **1993** and **1995** as additional evidence of pretext arguing that they belie defendant's arguments regarding competitiveness in the local ambit.

#### (1) *1993 Study*

In support of their pretext allegations plaintiffs point to the fact that the Puerto Rico Employee Benefits Task Force designated in 1993[5] concluded that "conceptually all [were] in favor of [instituting] early retirement point system" and that the focus groups interviewed by a private researcher opined that BAXTER was "below the market in salary and benefits." However, the findings of the Total Compensation Study carried out established that "[o]verall, Baxter's base salaries in Puerto Rico are 93% of the comparator group... [and][b]enefits **are generally competitive.**" (Emphasis ours).

According to the 1993 study—based on a 100 median—the "total benefits" provided by BAXTER were 88% whereas the "**pension**" plan stood at 121%. Thus, even though **total benefits** fell below[6] the median the **pension** plan was **above** it.

Plaintiffs also attempt to discredit the explanations proffered by MARY BARK-

---

5. The purpose of the Task Force was to: (1) review and analyze employee benefits package available at the time, (2) evaluate retirement benefits and review feasibility of implementing a 165(e) plan in 1994 and/or the ER/PS, and (3) "determine how to maximize benefits dollars with respect to island-wide competitive industries while maintaining employee satisfaction, and overall affordability (i.e. no incremental cost) to Baxter."

6. As explained by BAXTER, "[i]n both 1993 and 1995, the absence of a defined contribution (165(e)) plan dragged Baxter's 'all retirement' index down... In 1995, Baxter was the only company out of the nine studied that did not have a defined contribution plan... That study ultimately led to Baxter's decision [in **1998**] to provide Baxter's Puerto Rico employees with a defined contribution plan." Defendants' Reply (docket No. 44) p.10 n.4.

ER for BAXTER's senior management's decision to only implement the medical plan changes in **1993** alleging a discrepancy between her **June 1, 1994** memorandum on this subject and the reasons advanced by ROBERTO PEREZ in his affidavit submitted in support of BAXTER's motion for summary judgment.

In his sworn statement ROBERTO PEREZ proffered two grounds for the rejection of the ER/PS implementation, i.e., "(1) Baxter's stock was doing poorly; and (2) Baxter senior management was not convinced that Baxter plants in Puerto Rico were not competitive with other Puerto Rico manufacturers with respect to compensation and benefits."[7] PEREZ Aff. ¶ 6.

MS. BARKER's **June 1, 1994** memorandum regarding "Concerns about Puerto Rico Benefit Plans" highlights the expectations created among the local employees concerning retirement plans generated by the inquires carried out in **1993.** The memorandum specifically concedes that after "[e]xtensive benchmarking and survey work... done to see how our benefits and compensation compared to other companies in Puerto Rico [ ][w]e satisfied ourselves that even without the 165E Plan, we were very competitive with other companies."

In the aforementioned memorandum MS. BARKER further explains the reasons for senior management declining to extend the ER/PS as follows:

Because of concerns about developing medical trends, tax law changes and business pressures, the decision was made to change medical benefit plan levels and not to change, add or improve, the pension plans.

. . . . .

The Tax Department has alerted us to the sensitives around any increase in benefit plans in Puerto Rico due to our current deductivity levels.

Plaintiffs rebuff BAXTER's proffered economic arguments as pretextual citing to the savings brought about by the Task Force's proposed modifications to the medical plan. However, at the time these represented potential, not concrete savings. In her deposition MS. BARKER further expounded on the reasons for only implementing the medical benefit plan changes and not the ER/PS as follows:

There was concern about the cost of implementing the changes. There were concerns that the cost savings on the medical plan might not materialize. There was concern because of the business conditions at the time.

When asked during her deposition to explain what she meant by "business conditions" MS. BARKER responded:

[T]here was a discussion of the fact that our stock price was not doing very well at that particular time. There were concerns over the uncertainty of certain tax changes which were... being discussed in Puerto Rico at that time, which could potentially impact the business, and there was uncertainty around that and did not seem to be any clear... answers to that question.

I believe that there was some discussion about the overall cost competitiveness of Puerto Rico, in comparison to other operations around the world, and making sure that it was cost-competitive.

BARKER Depo. p. 72–3.

Plaintiffs argue that the fact that MS. BARKER did not specifically mention

---

7. It is important to note that the conclusion regarding competitiveness of benefits in relation to other industries is consistent with the findings of the **1993** study.

"stock prices" in her **1994** memorandum somehow renders the version in the affidavit of ROBERTO PEREZ untrue.

We do not find that the additional reasons included in MS. BARKER's **1994** memorandum and subsequently expounded in her deposition are at odds with those advanced by ROBERTO PEREZ particularly when his three-page declaration merely provides a succinct account of BAXTER's economic motivations.

Further, MS. BARKER's **1994** memorandum does make reference to the two points cited by MR. PEREZ. First, it alludes to the **1993** study and its findings to the effect that the benefits offered to the BAXTER–PR employees were comparable to those provided at the time by the other local industries. Further, the term "business pressures" in the context of her memorandum is consonant with the decrease in stock value in **1993**.

In refuting BAXTER's argument regarding the decline in stock value as a valid argument plaintiffs point to the **1994** Annual Report to Stockholders which although confirming a drop in stock value for **1993** also reflects gains both in the preceding and subsequent years, i.e., **1992** and **1994**. Further, the Report accounts for the **1993** loss as "primarily reflect[ing] the provisions for restructuring and litigations charges" which, plaintiffs argue, was temporary and attributable to "extraordinary" and "foreseeable" circumstances.

However, the fact that the stock value may have improved the following year does not detract from the uncontested fact that in **1993,** the critical period for purposes of its decision, BAXTER experienced serious losses. Further, it is a safe

argument to say that the future activity of any stock is not a foreseeable event.

### (2) *1995 Study*

In **1994** the Puerto Rico Advisory Council was established to, among other matters, evaluate and make recommendations regarding BAXTER–PR employee benefits.[8] The Council in turn appointed a committee (Puerto Rico Benefit Revision Committee) to propose changes to the pension plan and evaluate alternatives for financing those changes.

The Council, as well as ROBERTO PEREZ advocated for extending the ER/PS. In his deposition ROBERTO PEREZ justified his position as "the fair thing to do" but acknowledged that "because of the cost implications" implementation was unlikely.

MARY BARKER testified in her deposition that she personally favored the ER/PS for Puerto Rico and initially endorsed it but subsequently changed her opinion due to the "substantial increase in cost" since the **1993** study [BARKER depo. pp. 156–7] which she also described as "significant costs". BAKER depo. p. 158. MS. BARKER's reasons for changing her mind were further explained during her deposition as follows:

> Because I think market dynamics have [sic] changed in the interim, and I think that the market moved very much towards more of a 165(e) type of plan. It became apparent to me from the studies that we saw that, without a 165(e), it was going to be difficult for us to attract talent on the island going forward.

> The cost impact of the pension point system, when we got these numbers in 1995, the evaluation, in my mind, was a

8. Its responsibilities included the "[n]eed to enhance the pension plan to the domestic standard [and the] [n]eed to find avenues to finance the plan or minimize impact if enhanced".

very different evaluation than it had been in 1993.

BARKER depo. p. 159.

Plaintiffs refer to a Total Compensation Study carried out in 1995 for the proposition that in that year "Baxter was worse [than in 1993] in terms in competitive posture" because according to the study "on total compensation (all pay components) Baxter was 23.3% below the 50th percentile." [9] Plaintiffs' Motion and Memorandum in Opposition (docket No. 43) p.11. However, as defendant correctly points out, for purposes of our analysis, the relevant inquiry is not **total compensation** comparison but the terms of the **pension** plan which, according to the **1995** study, was 111.5% of a 100 median, *i.e.*, still above the median.

### c) Carolina Plant Closing

In **October 1995** BAXTER announced the closing of the Carolina plant, one of its largest plants in Puerto Rico. The closing was programmed to be carried out in stages over a period of various years commencing in **January 1996** and ending in **December 1998.**

During this time employees from the Carolina facility urged BAXTER to enhance their retirement benefits and extend the ER/PS to the **Puerto Rico Plan.** In response to this petition in **February 11, 1997** BAXTER sent a letter signed by MIKE TUCKER, Senior Vice President of Human Resources explaining the reasons for BAXTER's position. This correspondence related the evolution of the early retirement benefits under the **Puerto Rico Plan** which MR. TUCKER summarized as follows:

In 1987 Baxter established a subsidy of early retirement. This subsidy provides a higher monthly benefit to the employees who start to receive the benefits before 65 years of age, have at least 10 years of service and are at least 55 years of age when they terminate their employment with Baxter. The age of 55 was chosen because it was the earliest age in which an employee could start receiving the benefits under the plan. Many pension plans do not offer this subsidy for early retirement. However, Baxter acknowledges that people who terminate their employment at 55 or more could have difficulty in obtaining other employment than persons who are younger than 55... Baxter has chosen the age of 55 and 10 years of service as the separation point for the additional subsidy for early retirement in Puerto Rico.

The letter also included the reasons why the amendments requested by the employees were not viable. Again, cost implications were the determining factor for declining the employees' petition. According to the letter the total cost of benefits in Puerto Rico represented 28% of the payroll and any increase thereto would have raised manufacturing costs and render product prices non-competitive.

The added costs to the pension plan were delineated as follows:

[A] pension plan based on a point system has an additional cost of 3 million dollars per year, thus increasing the cost of benefits in Puerto Rico to 31% of the payroll. The creation of a subsidy for employees younger than 55 years of age would duplicate the additional cost for a point system.

In 1998 BAXTER implemented a defined contribution pension plan. Accord-

---

**9.** Even though the study concluded that "[o]verall, employee benefits are 31.4% below the median market" as indicated at n.5 *ante* the lack of a defined contribution pension plan accounted for this discrepancy.

ing to PEREZ, as evidence of the ongoing benefits review process, "[i]n 1998, in order to stay competitive in Puerto Rico, Baxter did decide to implement one of the other proposals that had been made in Puerto Rico over the years, a defined *contribution* pension plan." Aff. ¶ 8 (emphasis in original).

### 4. Tradeoffs

Plaintiffs contend that the fact that the ER/PS was not extended to BAXTER–PR employees despite their implementation of significant cost-saving measures such as the medical and cafeteria plans represents additional evidence of pretext. Plaintiffs also point to the fact that the total cost of benefits in Puerto Rico is 28% of the payroll whereas it is 30% in the United States.

However, the results of the **1993** and **1995** studies as well as the analysis provided in the **1997** letter remain undisturbed and provide ample support for BAXTER's decision based on competitiveness both (1) relative to the other local employers as well as (2) maintaining a level of cost-competitive products.

### 5. Perception Second-class Status

Plaintiffs argue that the references made by ROBERTO PEREZ and MARY BARKER that the local employees held "second-class status" insofar as benefits was concerned because of the fact that their repeated requests and efforts to have their pension plan improved so as to be on a par with **Domestic Plan** benefits went unanswered is indicative of national origin discriminatory animus. However, according to the record this was the perception held by the local employees. There is no evidence that this was also the opinion of the BAXTER decision-making authority which is the proper standard for substantiating discrimination claims. *See, Straughn v. Delta Air Lines, Inc.,* 250

F.3d 23, 41 (1st Cir.2001) (appropriate inquiry is what the principal decision maker's "perception" of the events was, *i.e.,* that he *"reasonably believed"* the correctness of the reasons proffered). *See also, Shorette v. Rite Aid of Maine, Inc.,* 155 F.3d 8, 15 (1st Cir.1998) (plaintiff's own perception not probative of discrimination but rather employer's perception).

### 6. Queipo Report/Nevin Affidavit

BAXTER has moved to strike the report of ANTONIO QUEIPO, an actuary consultant, due to plaintiffs' failure to timely disclose him and also claiming the report is unreliable.[10] However, inasmuch as we have not relied on his conclusions in reaching our decision today we need not address the merits of the request.

As additional evidence of national origin discrimination plaintiffs submitted the affidavit of HILDA NEVIN, a retired BAXTER employee, who transferred from Puerto Rico to Illinois in the early **1980s.** In her declaration MS. NEVIN complained of the disparaging treatment given to her in Illinois which she perceived was due to her national origin. MS. NEVIN further claimed BAXTER refused to include her in the **Domestic Plan** after she transferred or to credit her Puerto Rico service years which contrasted with the benefits afforded her non-Puerto Rican husband who had begun his employment with Baxter in Mexico and was covered by the **Domestic Plan** regardless of location of employment.

Defendant has objected to this evidence as irrelevant. Not only did MS. NEVIN cease working for BAXTER in **1987,** that is three years prior to the adoption of the ER/PS but she was paid a lump-sum pension benefit under the **Domestic Plan** in **1986.**

---

10. *See,* Defendants' Motion to Strike Plaintiffs' Surreply (docket No. 48)

Therefore, we will not consider the allegations contained in her declaration in reaching our decision in this case.

### 7. Conclusion

The scope of our probe into BAXTER's determination is constrained by Title VII considerations and therefore, directed exclusively to discriminatory motivation. According to case law, BAXTER's business decisions regarding ER/PS are not reviewed for accuracy or fairness nor are we to examine if they are rational or mistaken.

Further, discrediting the reasons proffered by BAXTER by itself does not automatically establish disparate treatment discrimination under Title VII. Plaintiffs must also produce sufficient credible evidence of motive to effectively oppose defendants' summary judgment motion.

After all the dust has settled and at the end of the day what are we left with to consider as evidence of national origin discrimination? We find that plaintiffs' attempts to undermine the reasons proffered by BAXTER fail to create a genuine issue of material fact regarding origin-based discrimination in a disparate treatment setting. According to the studies carried out in 1993 and 1995 pension benefits offered to BAXTER–PR employees were comparable to those available to similar industries operating locally. Additionally, the cost impact of the added benefits over the product price presented further justification of its business decision.

Therefore, we find no material challenge to the reasons proffered by BAXTER for its decision nor evidence of discriminatory animus. According to the record, BAXTER's market-based rationale for its decision was not a pretext for national origin discrimination

We are not here to judge whether BAXTER's determination was good or bad or whether it was "the fair thing to do" under the circumstances. The court empathizes with plaintiffs' situation after rendering many years of services but it is bound to adhere to the law and the legal standard required to establish disparate discriminatory treatment.

### B. DISPARATE IMPACT

■ Title VII disallows "both 'overt discrimination' in the form of disparate treatment... and more subtle forms of discrimination, known as disparate impact discrimination, arising from ' the *consequences* of employment practices, not simply the motivation.' " *E.E.O.C. v. Steamship Clerk's Union*, 48 F.3d 594, 601 (1st Cir.1995) *cert. den.*, 516 U.S. 814, 116 S.Ct. 65, 133 L.Ed.2d 27 (citing *Griggs v. Duke Power Co.*, 401 U.S. 424, 431–32, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971)).

■ Disparate impact under Title VII outlaws "employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and cannot be justified by business necessity." *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977) *cited with approval in Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609, 113 S.Ct. 1701, 123 L.Ed.2d 338 (1993). *See also, Watson v. Fort Worth Bank and Trust*, 487 U.S. 977, 986–7, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988); *Bramble v. Am. Postal Workers Union*, 135 F.3d 21, 26 (1st Cir.1998).

■ Disparate treatment is used in situations where an employee is treated less favorably because of an impermissible factor whereas disparate impact occurs when a neutral employment practice has an adverse impact on a protected class. *Hazen Paper Co.*, 507 U.S. at 609, 113 S.Ct. 1701;

*Int'l Bhd. of Teamsters,* 431 U.S. at 335 n. 15, 97 S.Ct. 1843.

The linchpin of a disparate treatment claim is proof of the employer's discriminatory motive. Not so a claim of disparate impact: that type of claim is predicated not on proof of intentional discrimination, but, rather, on proof that the employer utilizes employment practices that are facially neutral in their treatment of different groups but... in fact fall more harshly on one group than another and cannot be justified by business necessity.

*Mullin v. Raytheon Co.,* 164 F.3d 696, 699–700 (1st Cir.1999) (citations and internal quotation marks omitted).

 Thus, disparate treatment rests on discriminatory intent and motive whereas disparate impact is premised on the discriminatory results instead. *Int'l Bhd. of Teamsters,* 431 U.S. at 335 n. 15, 97 S.Ct. 1843 (proof of discriminatory intent "critical" for disparate treatment cases but not required to establish disparate impact.) Discrimination "is not always a function of a pernicious motive or malign intent" but may be the consequence of neutral policies and practices that unduly prejudice employees falling within the protected categories established in Title VII. *E.E.O.C. v. Steamship Clerks Union,* 48 F.3d at 601. "[T]he necessary premise of disparate impact approach is that some employment practices, adopted without a deliberately discriminatory motive, may in operation be functionally equivalent to intentional discrimination." *Watson v. Fort Worth Bank and Trust,* 487 U.S. at 987, 108 S.Ct. 2777. "In all events, however, a defendant's good faith is not a defense to a disparate impact claim." *E.E.O.C. v. Steamship,* 48 F.3d at 602.

 Plaintiff carries the initial burden of establishing the three elements required for a prima facie case under the disparate impact theory, i.e., "identification, impact, and causation." *E.E.O.C. v. Steamship,* 48 F.3d at 601. Accordingly, plaintiff must (1) specify the particular policy or practice under attack and how it has been utilized by the employer; (2) show a dissimilar effect on individuals covered by Title VII, and (3) establish a causal relationship between both. Once plaintiff has met this initial burden the onus falls upon the defendant to either challenge any of the elements of the prima facie case or "show... that the challenged practice is job-related and consistent with business necessity." *Id.* at 602. *See also, Donnelly v. Rhode Island Bd. of Governors,* 110 F.3d 2, 5 n. 2 (1st Cir.1997) (plaintiff carries initial burden to establish "adverseness and disparateness", *i.e.,* plaintiff adversely and disproportionately affected when compared to non-protected employees)

In establishing causal relationship plaintiff must show that the differences come as a result of the policy at issue and not other unrelated causes. In *Donnelly* the court held that plaintiffs failed to make out a prima facie case absent evidence that "*similarly* situated males were better paid" since the disparity in compensatory scheme was due to the female professors' choice of academic field and market forces not their sex. *Id.* at 5

Consistent with plaintiff's burden of disparate impact "[i]f the defendant fails in its efforts to counter the plaintiff's prima facie case, then the factfinder is entitled—though not necessarily compelled—to enter judgment for the plaintiff. On the other hand, even if the defendant stalemates the prima facie case by elucidating a legitimate, nondiscriminatory rationale for utilizing the challenged practice, the plaintiff may still prevail if [he] is able to establish that the professed rationale is pretextual. The plaintiff might demonstrate, for example, that some other prac-

tice, without a similarly undesirable side effect, was available and would have served the defendant's legitimate interest equally well. Such an exhibition constitutes competent evidence that the defendant was using the interdicted practice merely as a pretext for discrimination." *E.E.O.C. v. Steamship*, 48 F.3d at 602 (citations and internal quotation marks omitted).

The factors necessary for upholding a "business necessity" defense are far from clear. *See, id.* at 607 ("the meaning and scope of the 'business necessity' concept are blurred at the edges.")

The disparate impact theory originated in *Griggs v. Duke Power Co.*, where the Supreme Court struck down a facially neutral test that operated to disproportionately exclude blacks [African American] from employment but did not measure skills related to those jobs. In so ruling the court determined that Title VII "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation. The touchstone is business necessity." *Id.* at 431, 91 S.Ct. 849.

Subsequent jurisprudence construed the "business necessity" narrowly and required that "a discriminatory employment practice must be shown to be necessary to safe and efficient job performance to survive a Title VII challenge." *Dothard v. Rawlinson*, 433 U.S. 321, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977); *see also, Albemarle Paper Co. v. Moody*, 422 U.S. 405, 95 S.Ct. 2362, 45 L.Ed.2d 280 (1975).

The Supreme Court moved away from its previous strict business necessity stance in disparate impact cases by ruling that "there is no requirement that the challenged practice be 'essential' or 'indispensable' to the employer's business for it to pass muster". *Wards Cove Packing Co., Inc. v. Atonio*, 490 U.S. 642, 659, 109 S.Ct. 2115, 104 L.Ed.2d 733 (1989). Further, defendant's burden was made easier by extending the disparate treatment allocation of proof mechanism to disparate impact cases. "In this phase the employer carries the burden of producing evidence of a business justification for his employment practice. The burden of persuasion, however, remains with the disparate-impact plaintiff... [t]he ultimate burden of proving that discrimination against a protected group has been caused by a specific employment practice remains with the plaintiff *at all times*." *Id.* 490 U.S. at 659, 109 S.Ct. 2115 (internal citations and quotation marks omitted, italics in original).

As a reaction to this new approach—which made plaintiff's onus more taxing—Congress codified the disparate impact standard in the amendments to the Civil Rights Act of 1991 to reinstate the stricter "business necessity" and "job relatedness" assay provided for in *Griggs v. Duke Power* and other pre *Wards Cove* decisions.[11]

The disparate impact standard now appears at 42 U.S.C. § 2002e–2(k) and provides.

(1)(A) An unlawful employment practice based on disparate impact is established... only if -

---

**11.** For a detailed history of the 1991 amendments see, Linda Lye, Comment, *Title VII's Tangled Tale: The Erosion and Confusion of Disparate Impact and the Business Necessity Defense,* 19 Berkeley J. Emp. & Lab. L. 315 (1998); Susan G. Grover, *The Business Necessity Defense in Disparate Impact Discrimination Cases,* 30 Ga. L.Rev. 387, 391 (1996); Brendan Sweeney, Comment, *"Downsizing"*

*the Age Discrimination in Employment Act: The Availability of Disparate Impact Liability,* 41 Vill. L.Rev. 1527 (1996) and Rosemary Alito, *Disparate Impact Discrimination under the 1991 Civil Rights Act,* 45 Rutgers L.Rev. 1011 (1993). *See also, Donnelly v. Rhode Island Bd. of Educ.,* 929 F.Supp. 583, 593 (D.R.I.1996).

(i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact on the basis of race ... or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity; or

(ii) the complaining party ... demonstrat[es] ... an alternative employment practice and the respondent refuses to adopt such alternative employment practice.

Even though disparate impact has been used to establish claims alleging discrimination in benefits its application is quite uncommon essentially because this doctrine "developed out of the language in section 703(a)(2) [42 U.S.C. § 2000e–2(a)(2) ] prohibiting discrimination based on deprivation of employment opportunities, such as the opportunity to be hired or promoted." *Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1485 (9th Cir.1993) *cert. den.*, 512 U.S. 1228, 114 S.Ct. 2726, 129 L.Ed.2d 849 (1994). "While the disparate impact theory is clearly available in suits alleging discriminatory denial of employment opportunities, it is not obvious that the theory applies generally to suits challenging discriminatory terms and/or conditions of employment." § 20.05 Larson at 20–15. *See also*, Laurie Dechery, Note, *Preferential Treatment or Discriminatory Standards: Do Employer-provided Insurance Plans Violate Title VII when They Exclude Treatment for Breast Cancer?*, 80 Minn. L.Rev. 945, 962 (1996) ("Courts rarely apply disparate impact analysis to alleged discrimination in benefits.")

This issue has yet to be decided by the Supreme Court. However, we find no obstacle to extending its application to the denial of benefits in appropriate cases.

The 1991 Civil Rights amendment codifying the disparate impact mechanism does not restrict in any way its application to disparate treatment cases but rather applies to "unlawful employment practice[s]" 42 U.S.C. § 2000e–2(k)(1)(A).[12]

■ In support of their disparate impact claim plaintiffs argue that BAXTER's decision not to implement the point system [and medical and life insurance coverage] for early retirement to workers in Puerto Rico constitutes the requisite neutral "practice or policy" having a disproportionate effect on its local Puerto Rican labor force. Specifically, they argue that "the establishment of two separate and unequal retirement compensation schemes, one of which is almost exclusively for Puerto Rican employees and is decidedly inferior as compared to the other one which is primarily available to non-Puerto Ricans cannot be found to be anything other than a practice or policy. It treats Puerto Ricans in a disparate and less favorable manner than their non-Puerto Rican counterparts." Plaintiffs' Surreply (docket No. 45) pp.6–7.

---

**12.** This provision reads:

**(k) Burden of proof in disparate impact cases**

(1)(A) An unlawful employment practice based on disparate impact is established under this subchapter only if -

(i) a complaining party demonstrates that a respondent uses a particular employment practice that causes disparate impact on the basis of race, color, religion, sex or national origin and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity; or

(ii) the complaining party makes the demonstration described in subparagraph (C) with respect to an alternative employment practice and the respondent refuses to adopt such alternative employment practice.

We find, however, this argument is misplaced and is applicable instead to a disparate treatment claim.

Plaintiffs' cause of action stems not from an apparently neutral policy of general application to all BAXTER employees which in its application has a disparate effect on employees of a particular national origin. This would be the case, for instance, of a single pension plan which consistently excluded Puerto Ricans from certain benefits awarded to similarly situated non-Puerto Ricans. The discrimination at issue in this litigation centers instead on BAXTER's conscious decision not to extend certain benefits to its Puerto Rico employees. Specifically, the allegations in the complaint arise from the purportedly disparate treatment given to BAXTER's local employees caused by defendant's determination to utilize two different pension plans—one allegedly inferior to the other. Thus, the controversy centers on the markedly different treatment given to two types of individuals, i.e., Puerto Rico employees vis à vis non-Puerto Rico employees which falls squarely under the disparate treatment analysis and not on the consequences brought about by the adoption of a particular pension plan.

Therefore, we conclude that upon review of the allegations submitted by plaintiffs it is the discriminatory treatment given by BAXTER to its Puerto Rico employees that is under attack not the discriminatory effects of the Puerto Rico pension plan. Accordingly, the disparate impact claims are hereby **DISMISSED.**

### V. *ERISA*

 Plaintiffs contend BAXTER's failure to grant them the same benefits as stateside employees covered by the **Domestic Plan** constitutes a violation of fiduciary duties under ERISA. In pertinent part, the complaint reads:

27. The aforementioned policies, practices, acts and omissions of defendants.... constitute a breach of fiduciary duty because the unlawful discrimination described above exposed and exposes the Puerto Rican Plan to loss of favorable tax status and federal legal guarantees which jeopardize the stability and existence of the Puerto Rican Plan.

 Pursuant to 29 U.S.C. § 1002(21)(A) "[f]iduciary duties [under ERISA]... attach to persons who exercise discretionary authority or control respecting 'management of [the] plan or... management or disposition of its assets.'" *Campbell v. BankBoston, N.A.*, 327 F.3d. 1, 3 (1st Cir.2003). Amendments effectuated to the terms of a pension plan—even if the decision entails who will receive benefits and/or the formula for calculation of benefits—do not fall within the scope of ERISA's fiduciary obligations. *Lockheed Corp. v. Spink*, 517 U.S. 882, 890–91, 116 S.Ct. 1783, 135 L.Ed.2d 153 (1996); *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 78, 115 S.Ct. 1223, 131 L.Ed.2d 94 (1995); *Campbell v. BankBoston, N.A.*, 327 F.3d at 3.

Accordingly, the claim for breach of fiduciary duties under ERISA is hereby **DISMISSED.**

### VI. *P.R. CIVIL CODE*

 Plaintiffs having conceded that ERISA preempts their Third Claim for Relief[13] asserted under the provisions of the Puerto Rico Civil Code[14] the same is hereby **DISMISSED.**

---

**13.** *See,* Plaintiffs' Motion and Memorandum in Opposition... (docket No. **43**) p.19 n.5.

**14.** *See,* Complaint ¶ 29.

## VII. *CONCLUSION*

Based on the foregoing the Defendants' Motion for Summary Judgment (docket No. 42) [15] is **GRANTED** and the complaint filed in this case is hereby **DISMISSED**.

Judgment shall be entered accordingly.

IT IS SO ORDERED.

## JUDGMENT

The Court having dismissed the complaint filed in this case through its Order issued on this date, it is hereby

ORDERED AND ADJUDGED that the complaint filed in this case be and the same is hereby **DISMISSED.**

IT IS SO ORDERED.

---

**15.** *See,* Plaintiffs' Motion and Memorandum in Opposition... (docket No. **43**); Defendants' Reply... (docket No. **44**); Plaintiffs' Surreply... (docket No. **45**), and Defendants' Response... (docket No. **46**). Defendants' Motion Attaching Exhibit Page (docket No. **54**) is NOTED. Leave to file Response... (docket No. **49**) is **GRANTED.** Plaintiffs' Motion to Strike Defendant's Response... (docket No. **50**) is **DE-NIED**. Defendants' Motion Attaching Exhibit Page (docket NO. **54**) is **NOTED**.