# United States Court of Appeals
## For the First Circuit

No. 02-1695

JAMES W. CAMPBELL,

Plaintiff, Appellant,

v.

BANKBOSTON, N.A.; BANKBOSTON SEPARATION PAY PLAN; HELEN DRINAN,
administrator; BANKBOSTON CASH BALANCE RETIREMENT PLAN;
RETIREMENT PLAN COMMITTEE, administrator,

Defendants, Appellees.

---

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Morris E. Lasker,[*] Senior U.S. District Judge]

---

Before

Lynch, Circuit Judge,
Farris, Senior Circuit Judge,[**]
and Lipez, Circuit Judge.

---

Robert O. Berger for appellant.

Robert B. Gordon with whom Joseph P. Mingolla and Ropes
& Gray were on brief for appellees.

---

March 7, 2003

---

[*] Of the Southern District of New York, sitting by
designation.

[**] Of the Ninth Circuit, sitting by designation.

**LYNCH**, <u>**Circuit Judge**</u>. At the heart of this case is the debate over cash balance pension plans, a new type of plan that favors, in many cases, younger workers over those closer to retirement age. The plaintiff, James W. Campbell, is a former employee of BankBoston, a business that switched from a traditional defined benefit plan to a cash balance system. He sued, alleging violations of the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 <u>et seq.</u> (2000), and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. § 621 <u>et seq.</u> We affirm the district court's entry of summary judgment for the defendants.

I.

There is no dispute as to the facts. Campbell was continuously employed by BankBoston, N.A. and its corporate predecessors for thirty-seven years, through September 30, 1998. For the entirety of his employment, he worked in the domestic institutional custody business, which held and traded securities for mutual, pension, and endowment funds. Campbell had reached the position of senior fiduciary specialist; he was primarily responsible for ensuring compliance with Regulation 9 of the Office of the Comptroller of the Currency, in the United States Treasury Department. <u>See</u> 12 C.F.R. pt. 9 (2002) (regulating the fiduciary activities of national banks).

Two different plans are at issue in this case. The first is a Separation Pay Plan, adopted in 1996 and amended in 1998.

Campbell says he was entitled to benefits under the Plan. The second is the retirement plan, which BankBoston converted to a cash balance plan in 1989 and amended in 1997. The effect of the conversion and amendment, in practice, was to reduce Campbell's retirement benefits by about $3,000 a year from what he would have expected to receive had the plan not been amended in 1997.

A. <u>Separation Pay Plan</u>

BankBoston's predecessor, the First National Bank of Boston, adopted a Separation Pay Plan on June 15, 1996, which provided compensation for employees "whose employment is terminated as a result of work force reduction or job elimination." It did not apply to those who voluntarily left the company. It also required employees to make a "reasonable and effective effort to secure a comparable position" of employment, defined as one with a base salary within 10% of the current job and which "requires a reasonably similar employment background and skill set." The plan paid two weeks base pay for each full year of service. The Plan Administrator was given sole discretion to establish rules to administer the plan, to interpret and construe it, and to determine eligibility. Moreover, the administrator had the power to amend, modify, or discontinue the plan for any reason at any time.

On July 20, 1998, BankBoston announced the sale of its domestic institutional custody business to Investors Bank and Trust (IBT). IBT is not a national bank and thus does not fall under the

scope of Regulation 9. See id. § 9.1(c). The agreement with BankBoston required IBT to offer comparable jobs to all BankBoston custody employees. The sale closed on October 1, 1998.

BankBoston announced that it would treat a refusal to accept a position with IBT as a "voluntary resignation" under the separation plan, thus denying the severance package to those custody employees who did not accept a job with IBT. Many employees complained that this interpretation was contrary to the severance plan, which only denied benefits if employees did not pursue "comparable internal job opportunities." The employees took that phrase to mean BankBoston jobs, not job offers from other companies. In response, on September 30, 1998, the last day of employment for those working in the custody business, the plan administrator, Helen Drinan, amended the plan. The new amendment excluded those who refuse an offer of employment from "an employer who acquires any of the assets or operations of a BankBoston company or business."

Campbell was offered a position at IBT. Because IBT was not a national bank, it did not need to comply with Regulation 9; thus, the job IBT offered to Campbell was not a Regulation 9 compliance position. IBT instead offered Campbell the position of Compliance Manager within its Trust and Custody Unit. Campbell declined the offer of employment. As a result, BankBoston did not pay Campbell under the severance plan. At stake was two weeks of

pay for each of the thirty-seven years that Campbell had worked for BankBoston, a total of more than $100,000.

B.   The Cash Balance Plan

BankBoston's retirement plan prior to 1989 was a traditional defined benefit plan.  A defined benefit plan pays an annuity[1] based on the retiree's earnings history, usually the most recent or highest-paid years, and the number of completed years of service to the company.  The BankBoston plan was determined by a formula which factored in the retiree's years of service, the five-year average compensation at time of retirement, and the retiree's Social Security primary benefit.[2]

On January 1, 1989, BankBoston adopted the Cash Balance Retirement Plan.  Cash balance plans are a type of defined benefit plan that guarantee an employee a certain employer contribution level, usually an annual percentage of salary, plus a fixed percentage of interest.  Cash balance plans may superficially resemble defined contribution plans, in which an employer deposits a fixed amount into an account.  However, cash balance plans are

_____

[1] An annuity is simply an obligation to pay a fixed sum of money periodically.  See Black's Law Dictionary 88 (7th ed. 1999). The BankBoston plan provided for a monthly benefit.

[2] More specifically, the plan multiplied the average of the five highest years of salary by the years of service; the retirement annuity was 1.75% of that number, offset by various other factors such as a reduction for retirement before age 62 and an offset for Social Security payments.  Campbell's five-year average salary was $70,408.39 at the end of 1996 and $74,418.38 by October 1, 1998.

actually defined benefit plans, because the level of interest is guaranteed.

The plan version adopted in 1989 contained a "Benefit Safeguard Minimum Benefit" guaranteeing that, for long-term employees such as Campbell, the retirement benefits would be at least as much as would have been payable had the previous defined benefit plan still been in place upon their retirement. One effect of this provision was that the benefits due under the previous plan continued to accrue for those long-term employees protected by the grandfather clause.

In 1995, BankBoston commissioned a study of its benefits program, which concluded that this grandfather provision would cost the company a significant amount of money. Thereafter, on January 1, 1997, BankBoston again amended its retirement plan; this amendment eliminated the continued accrual of benefits under the previous defined benefit plan after December 31, 1996. There is no contention that this amendment lacked Internal Revenue Service (IRS) approval. All accrued benefits were converted to cash balance accounts by calculating the value of accrued benefits as of the end of 1996 and crediting that amount in separate conversion accounts, where they continued to earn interest. Because Campbell would receive less under a cash balance formulation than under the Benefit Safeguard, even after that provision had ceased to accrue

benefits, the December 31, 1996 amendment had the effect of ending Campbell's pension accrual altogether.

After the sale of BankBoston's custody business to IBT, Campbell applied for retirement benefits. Under the retirement plan in place before January 1, 1997, Campbell's benefit under the older defined benefit plan would have kept accruing until his retirement on September 30, 1998. He would therefore have expected to receive $31,882.12 per year. However, under the 1997 plan amendment, Campbell was due only $28,798.10 per year, an annual difference of $3,084.02.[3]

## II.

Campbell filed a complaint in federal court on December 10, 1999. The original complaint named only BankBoston as a defendant; Campbell later amended the complaint to include additional defendants: the Separation Pay Plan; Helen Drinan, the plan administrator; the Cash Balance Retirement Plan; and the Retirement Plan Committee. The amended complaint contained seven causes of action. Campbell alleged that the Separation Pay Plan's denial of benefits constituted a violation of ERISA, 29 U.S.C. § 1001 et seq., and a breach of the covenant of good faith and fair dealing. He alleged that the Retirement Plan's replacement of the

---

[3] These annual benefits represent the amount Campbell would receive under a single life annuity, payable until death. BankBoston's plan also permitted other annuity options, such as joint and survivor annuities.

older defined benefit plan with a cash balance plan violated ERISA, the covenant of good faith and fair dealing, and ADEA. Campbell also alleged that he was wrongly terminated because he was not permitted to continue to work for BankBoston following the sale of the custody business to IBT, and that he was discriminated against on the basis of age because he and other highly compensated employees were not permitted to participate in an early retirement program.

On May 17, 2002, the district court granted the defendants' motion for summary judgment on all seven counts. Campbell v. BankBoston, N.A., 206 F. Supp. 2d 70, 73 (D. Mass. 2002). Campbell appeals the grant of summary judgment as to his ERISA challenge to BankBoston's pension plan, his ERISA challenge to the denial of payment of separation plan benefits, and his age discrimination challenge to the retirement plan.[4]

III.

A. Standard of Review

We review a grant of summary judgment "de novo, construing the record in the light most favorable to the nonmovant and resolving all reasonable inferences in that party's favor." Rochester Ford Sales, Inc. v. Ford Motor Co., 287 F.3d 32, 38 (1st Cir. 2002). When reviewing the actions of plan administrators for

---

[4] Campbell does not appeal his wrongful termination claim, his claim of discrimination based on the early retirement program, or either claim based on the covenant of good faith and fair dealing.

challenges to denials of benefits under 29 U.S.C. § 1132(a)(1)(B), the standard of review depends on the discretion afforded the administrator. If the benefit plan grants the administrator "discretionary authority to determine eligibility for benefits or to construe the terms of the plan," we review only to ensure that the administrator's decision is not "arbitrary or capricious"; if the plan does not grant such discretionary authority, we review benefit decisions de novo. Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 109-15 (1989); see Terry v. Bayer Corp., 145 F.3d 28, 37 & n.6 (1st Cir. 1998). We need not decide which standard applies because, for reasons we explain below, we do not reach the issue of Campbell's only challenge to a plan administrator's decision.

B. Separation Pay Plan

Campbell contends that at the time his position at BankBoston was terminated, he was owed severance pay under the Severance Pay Plan. He challenges the denial of severance plan benefits under 29 U.S.C. § 1132(a)(1)(B), which creates an action for plan participants or beneficiaries to recover benefits due.

The severance plan amendment adopted on September 30, 1998, clearly and unequivocally denied Campbell severance pay upon his refusal to accept a job offer from IBT. Campbell's challenge, then, depends both on a claim that the severance plan was

impermissibly amended, and that he was due severance pay under the original plan.

The Separation Pay Plan listed seven exceptions to separation pay eligibility. One of these exceptions included employees who "accept a position with another Bank of Boston company or continue employment with an employer who acquires any of the assets or operations of a Bank of Boston company or business." On September 30, 1998, Drinan modified this exception to include employees who "accept a position with another BankBoston company or continue employment with, or refuse an offer of employment by, an employer who acquires any of the assets or operations of a BankBoston company or business."

Campbell argues that the amendment was invalid because the plan administrator owes fiduciary duties to him. Thus, he says, his right to severance pay should be determined under the text of the plan before it was amended.

Fiduciary duties do attach to persons who exercise discretionary authority or control respecting "management of [the] plan or . . . management or disposition of its assets." 29 U.S.C. § 1002(21)(A). A person has such fiduciary duties only when fulfilling these defined roles. The act of amending the terms of a plan is not one to which a fiduciary duty applies. See Curtis-Wright Corp. v. Schoonejongen, 514 U.S. 73, 78 (1995) (applying this distinction to welfare benefit plans such as severance plans);

-10-

see also Lockheed Corp. v. Spink, 517 U.S. 882, 890-91 (1996) (extending this rule to pension benefit plans). This is true even when the employer's amendment effectively makes a decision "such as who is entitled to receive Plan benefits and in what amounts or how such benefits are calculated." Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 444 (1999).

Campbell argues that the existence of a fiduciary duty depends not on the type of action taken but on the identity of the actor: whether the plan sponsor or an independent administrator is amending the plan. Because the plan administrator, Drinan, was a fiduciary with regard to the management and distribution of the assets, Campbell rationalizes, her fiduciary duty also applied to her amendment of the plan. This argument fails. The ERISA fiduciary duty doctrine envisions that one entity will have fiduciary duty attach to some activities but not others; the existence of a duty turns not on who acts but on the nature of the action. See, e.g., Lockheed Corp., 517 U.S. at 890; Curtiss-Wright Corp., 514 U.S. at 78. Though Drinan's management decisions were under the auspices of fiduciary duty, her decision to amend the plan was not. The fact that here the plan administrator was a natural person and not a corporation -- as in many of the Supreme Court decisions -- is of no moment; ERISA defines "person" to mean both individuals and organizations, such as corporations, 29 U.S.C.

§ 1002(9).  As a result, that is not a relevant distinction under ERISA.

There are statutory limits, imposed by ERISA, on the ability of an employer to amend a plan involving vested benefits. For example, amendments may not decrease the accrued benefit of a participant.  29 U.S.C. § 1054(g).[5]  Until they are paid, however, severance plan benefits have not vested.  A severance plan is defined as a "welfare benefit plan," see id. § 1002(1); Massachusetts v. Morash, 490 U.S. 107, 116 (1989), and as such, severance plans are exempted from the vesting and funding sections of ERISA, 29 U.S.C. §§ 1051(1), 1081(a)(1); see Allen v. Adage, Inc., 967 F.2d 695, 698 (1st Cir. 1992).  Thus, employers may amend or eliminate a severance pay plan at any time.  Curtiss-Wright Corp., 514 U.S. at 78; Reichelt v. Emhart Corp., 921 F.2d 425, 430 (2nd Cir. 1990).

Because the plan administrator was not acting as a fiduciary when she amended the severance plan, and because employers have the right to amend or end a welfare benefit plan at any time, the September 30, 1998 amendment to BankBoston's Separation Pay Plan was proper.  Campbell does not contest that, under the terms of the amendment to the plan, he was not owed

---

[5] Cf. Cogan v. Phoenix Life Ins. Co., 310 F.3d 238, 242 (1st Cir. 2002) (holding that this section does not apply to unfunded "top hat" plans).

-12-

severance pay. It was not a violation of ERISA for Campbell not to have been paid benefits under the Separation Pay Plan.[6]

C.  Retirement Plan

### 1.  Background

The adoption of cash balance plans, and in particular the transition to such plans from more traditional annuity-based defined benefit plans, has become increasingly controversial.  The first cash balance plan was adopted in 1985.  Since that time, hundreds of companies have converted to the newer cash balance plans.

In traditional defined benefit retirement plans, such as BankBoston's pre-1989 plan, a large share of the pension benefits are reaped by older employees in their final years of service. This is because the benefits are calculated based on years of service to the company and on the average of the highest years of salary, which usually occur in the final years.  By contrast, in a cash balance system, much of the pension benefit is gained in the early years of service, because the pension account earns interest. The more time there is until retirement, the more a given amount in the account will grow.  Thus, even though early additions to the pension account may be based on a percentage of a much smaller

---

[6] Because we find that the amendment to the plan was proper under ERISA, we need not consider Campbell's contention that he was owed severance pay under the plan version which existed before the amendment.

salary, the effects of time mean that these additions will contribute to the final total much more than larger additions to the account entered closer to retirement.

There are many reasons why companies may wish to switch to a cash balance plan. Cash balance plans favor younger workers, while traditional defined benefit plans favor experienced employees who plan on staying with one company. Cash balance plans are also more portable than annuity-based plans, because they can be taken as a lump sum upon leaving the company. Thus, a move to a cash balance plan is one way for a company to attract younger and more mobile workers. Furthermore, if a company has an older workforce, a cash balance plan may be a cheaper plan to administer. Under a traditional plan, the largest benefits are earned in the years immediately preceding retirement. Because there is little time for interest to accrue, an annuity purchased to secure those benefits will be more expensive. Cash balance plans award benefits earlier in an employee's career, and so they may be less expensive for employers.

If begun from scratch, cash balance plans would not be terribly controversial. The controversy engenders from the transition from traditional defined benefit plans. Older workers, such as Campbell, expected to see their pension benefits rise dramatically as a result of their service just before retirement.

-14-

Instead, as a result of their companies' adoption of cash balance plans, their pension increases under the old plans ceased.

Under some plans, these workers whose traditional benefits have ceased to accrue are at least entitled to cash balance plan benefits. However, some transition schemes, including that employed by BankBoston, include a "wear-away" provision. This provision specifies that employees' pension entitlement does not grow until their pension benefits, as calculated under the new cash balance system, equal their actual accrued benefits under the old system. Benefits already earned under an old plan may not be taken away, see I.R.C. § 411(d)(6)(A) (2000); 29 U.S.C. § 1054(g), but benefits expected but not yet accrued are not similarly protected. The result is that for many workers, including Campbell, their pension benefits stop accruing completely in their final years of service, when their expectation was that during these years, the benefits would build up the most. See generally E.A. Zelinsky, The Cash Balance Controversy, 19 Va. Tax Rev. 683, 695-99, 702-04 (2000).

### 2. Accrued Benefits

As a result of BankBoston's conversion to a cash balance plan with a wear-away provision, Campbell's annual pension was $3,084.02 less than it would have been had the old plan been kept in place until his retirement. He argues that this reduction amounts to a forfeiture of an accrued benefit in violation of 29

U.S.C. § 1054(g). There was no forfeiture, because no accrued benefits were reduced; only expected benefits were reduced, which BankBoston could, under the law, modify or eliminate.

The ERISA anti-cutback provision protects against the erosion of "accrued benefits." Id. That term, in the defined benefit context, means "the individual's accrued benefit determined under the plan." Id. § 1002(23)(A). That amount is "equal to the employee's accumulated contributions." Id. § 1054(c)(2)(B).

The reduction of pension benefits of which Campbell complains was merely the elimination of future expected accruals of benefit. The December 31, 1996 amendment to the plan protected all of the pension benefit based on Campbell's work for the company up to that point; it merely ceased accruals under the old plan based on employment from that point forward. This was an elimination of an expected, not accrued, benefit. There was no ERISA violation.

3.   ERISA Age Discrimination: 29 U.S.C. § 1054(b)(1)(H)(i)

Campbell next makes to us a more sophisticated charge against BankBoston's cash balance plan: that BankBoston's cash balance plan violates the anti-discrimination provision of ERISA. This charge is a serious one, and its answer depends on an interpretation of the complex ERISA statutory scheme. Because Campbell did not raise this argument before the district court, he has waived it. This anti-discrimination challenge to cash balance

plans will doubtless be raised again before this or another court, and so we briefly describe the controversy.

ERISA has its own anti-age discrimination provision, 29 U.S.C. § 1054(b)(1)(H)(i), which states that a defined benefit plan does not meet the requirements of ERISA if "an employee's benefit accrual is ceased, or the rate of any employee's benefit accrual is reduced, because of the attainment of any age." See also I.R.C. § 411(b)(1)(H)(i) (containing an identical provision).[7] Campbell's challenge to BankBoston's cash balance plan, based on the work of Professor Edward Zelinsky, is that cash balance plans violate this provision because of the manner in which accrued benefits are calculated.

For defined benefit plans, the term "accrued benefit" means "the individual's accrued benefit . . . expressed in the form of an annual benefit commencing at normal retirement age." 29 U.S.C. § 1002(23)(A) (emphasis added). This measure is quite sensible as applied to traditional defined benefit plans, which provide an annual benefit upon retirement.

Cash balance plans such as BankBoston's are instead defined by a lump sum account balance, instead of the annual

---

[7] There is also a similar provision in the ADEA. See 29 U.S.C. § 623(i)(1)(A) (establishing that defined benefit plans may not require or permit "the cessation of an employee's benefit accrual, or the reduction of the rate of an employee's benefit accrual, because of age").

benefit to be paid upon retirement. In this respect they appear very much like defined contribution plans. If BankBoston's plan was in fact a defined contribution plan, benefit accrual would be measured by the balance in the individual's account. See id. § 1002(23)(B). Were that the case, there would be no question that BankBoston's plan does not violate the age discrimination provision of ERISA, because the plan donates a percentage of salary to the account; age is never calculated into the amount contributed by the employer.

The problem arises because cash balance plans are defined benefit accounts; thus, the argument goes, benefit accrual must be measured in terms of an annuity providing an annual benefit. In order to translate a cash balance lump sum into an annuity beginning at normal retirement age,[8] the age of the individual is very much relevant, because of the time value of money. An amount of money donated to a younger employee will have a longer time to accrue interest, and result in a larger annuity upon retirement, than the same amount donated to an employee closer to retirement age. Campbell argues that this effect means that under BankBoston's cash balance plan, using a metric which measures an annuity at retirement, older workers accrue less pension benefits solely due to age. See Zelinsky, supra, at 719-22.

_____

[8] This calculation is a simple accounting function, though it does depend both on the current interest rates and the mortality tables.

This conclusion is by no means uncontroverted. First, the ERISA age discrimination provision may not even apply to workers younger than the age of normal retirement. The Internal Revenue Code contains an identical provision, I.R.C. § 411(b)(1)(H); the heading to that provision reads: "Continued accrual beyond normal retirement age." The legislative history surrounding the enactment of the provision buttresses this argument. See Eaton v. Onan Corp., 117 F. Supp. 2d 812, 827 (S.D. Ind. 2000). Second, even if the age discrimination applies to employers younger than normal retirement age, such as Campbell, critics of the age discrimination argument have contended that there are various methods for determining benefit accrual rates under ERISA, and it is by no means clear that the annuity method is the only permitted method in this context. See R.C. Shea, M.J. Francese & R.S. Newman, Age Discrimination in Cash Balance Plans: Another View, 19 Va. Tax Rev. 763, 767 (2000).

The IRS has also reviewed the challenge to cash balance plans under the age discrimination provision of ERISA. On December 11, 2002, the IRS issued proposed regulations which attempt to address, among other issues, the proper definition of the rate of benefit accrual for cash balance plans for purposes of IRS approval of a plan. See Reductions of Accruals and Allocations because of the Attainment of any Age: Application of Nondiscrimination Cross-

<u>Testing Rules to Cash Balance Plans</u>, 67 Fed. Reg. 76,123 (proposed Dec. 11, 2002).

We need not resolve this complicated issue, for Campbell did not raise it before the district court. While his amended complaint generally alleges that the retirement plan violates ERISA provisions, it did not allege this theory in fact or in law. His count for "Discrimination" references ADEA, not ERISA. When defendants moved for summary judgment, his opposition argued only the forfeiture argument to the district court, and not the argument he now wishes to pursue. If the issue had been fairly raised in the district court, other evidence and argument would have been introduced into the record. "[I]ssues first asserted on appeal must be deemed waived." <u>Utica Mut. Ins. Co.</u> v. <u>Weathermark Invs., Inc.</u>, 292 F.3d 77, 81 (1st Cir. 2002); <u>see</u> <u>Sandstrom</u> v. <u>ChemLawn Corp.</u>, 904 F.2d 83, 87 (1st Cir. 1990). We do not consider Campbell's challenge to BankBoston's cash balance plan based on the ERISA age discrimination provision.

4.    <u>ADEA</u>

Finally, Campbell has alleged a violation of the ADEA. He argues that BankBoston knew that the decrease in pension benefits as a result of the conversion to the cash balance plan

would be particularly adverse to older workers.[9]  This claim is procedurally foreclosed.

Campbell's claim is barred because the charge was filed beyond the limitations period.  Campbell did not file a complaint with the EEOC until December 13, 1999.  EEOC charges must be filed within 180 days of the alleged unlawful practice; if there is an applicable state age discrimination law and agency, as there is here, see Mass. Gen. Laws ch. 151B (2002), the time period is extended to 300 days.  29 U.S.C. § 626(d).  Campbell was aware of the amendment to BankBoston's pension plan and the resulting effect on his benefits no later than October 14, 1998, when he wrote a letter to the Retirement Committee.  In that letter, Campbell referred to the description of his benefits earlier provided by BankBoston and challenged the benefits calculation.  The filing of the EEOC charge in December 1999 was well beyond the 300-day limitations period.

Campbell attempts to circumvent this limitations period by arguing that the statute of limitations requirement is met if at least one act in an ongoing pattern of discrimination falls within the 300-day period.  For this proposition, Campbell cites to AMTRAK v. Morgan, 536 U.S. 101 (2000), which held that for Title VII

---

[9] The parties disagree as to whether Campbell is asserting a disparate impact or a discriminatory treatment claim.  This circuit doubts that ADEA may be used to raise an impact claim.  Mullin v. Raytheon Co., 164 F.3d 696, 703-04 (1st Cir. 1999).  Our resolution on other grounds means we do not need to sort through this issue.

hostile environment claims, if any act that is part of the hostile work environment falls within the limitations period, the employee may include all other related acts in the charge. Id. at 125. Campbell's reliance on this case as support for his position is misplaced. The Supreme Court specifically found that hostile work environment claims were fundamentally different, id. at 123, and reiterated the rule that for other discrimination claims, "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges." Id. at 122. Moreover, acts must be "independently discriminatory." Id.

The only act about which Campbell complains which is within the time limitations period is the August 11, 1999 final denial of his request to correct his benefits. This act was not independently discriminatory. The alleged discrimination occurred when the decision concerning Campbell's pension benefits was made and communicated to him in October 1998. The limitations period began then, not when the grievance procedure to correct that decision was terminated. See Del. State Coll. v. Ricks, 449 U.S. 250, 261 (1980). By December 1999, that limitations period had run its course.

For the reasons stated above, we **affirm** the district court's grant of summary judgment to defendants.