# United States Court of Appeals

**FOR THE EIGHTH CIRCUIT**

_____

Nos. 07-3485 / 07-3593 / 07-3771 / 08-1910 / 08-2616

_____

|  |  |  |
|---|---|---|
| Edward W. Sunder; Louis R. Jarodsky, | * * * | |
| Plaintiffs-Appellees, | * * * | Appeals from the United States District Court for the Eastern District of Missouri. |
| v. | * * * | |
| U.S. Bancorp Pension Plan, | * * | |
| Defendant, | * * | [PUBLISHED] |
| U.S. Bank Pension Plan, | * * | |
| Defendant-Appellant, | * * | |
| Mercantile Bank Horizon 401(k) Investment & Savings Plan; Mercantile Bank Cash Balance Retirement Plan, | * * * * * | |
| Defendants. | * | |

_____

Submitted: April 13, 2009
Filed:  November 9, 2009

_____

Before MURPHY, HANSEN, and BYE, Circuit Judges.

_____

HANSEN, Circuit Judge.

These consolidated appeals and cross-appeal involve disputes under the Employee Retirement Income Security Act (ERISA) regarding a plan amendment and the amount of retirement benefits awarded to Edward W. Sunder and Louis R. Jarodsky, both of whom were participants in a pension plan sponsored by their employer and now known as the U.S. Bank Pension Plan ("USBPP").[1] In a summary judgment ruling, the district court dismissed the plaintiffs' ERISA-based age discrimination claim. Following a bench trial, the district court awarded damages to Sunder and Jarodsky on the ground that the conversion of the plan into a cash balance system decreased their accrued benefits in violation of Section 204(g) of ERISA, see 29 U.S.C. § 1054(g). USBPP appeals the award of damages, and Sunder and Jarodsky cross appeal the district court's determination of the date of the plan conversion and the adverse ruling on their ERISA age discrimination claim. We reverse the award of damages but affirm on the cross appeal.

I.

Sunder and Jarodsky each worked at Mercantile Bank in St. Louis, Missouri. Sunder retired at age 53 after a 31-year career making long-term investments, and Jarodsky retired at age 55 after working 22 years in investment management. Both retired in August of 2000, by which time Mercantile Bank had merged with Firstar, which in turn had become U.S. Bancorp.

During their employment, Sunder and Jarodsky each accrued benefits toward a pension under the Mercantile Bancorporation Inc. Retirement Plan, now merged into and known as USBPP. The plan was amended and converted into a cash balance

---

[1] While other entities were also sued, the parties agreed that USBPP is the correct defendant, and the district court therefore dismissed the other three entities listed as defendants.

system prior to their retirements. For the sake of clarity, we will refer to the original plan as "the Mercantile Plan," and the amended plan after the conversion as "the Cash Balance Plan."

The Mercantile Plan was a fixed income defined benefit plan set up to provide employees with a fixed monthly annuity at retirement based on each employee's years of service and income level. Under ERISA, a "'defined benefit plan' means a pension plan other than an individual account plan."[2] 29 U.S.C. § 1002(35) (2000). Typically, a defined benefit plan "consists of a general pool of assets rather than individual dedicated accounts" from which "the employee, upon retirement, is entitled to a fixed periodic payment." Hughes Aircraft Co. v. Jacobson, 525 U.S. 432, 439 (1999) (internal marks omitted).

In mid-December 1998, the plan participants received a 15-day notice that the Mercantile Plan was converting to a cash balance system. By way of background, at the time of the plan conversion, and at the time Sunder and Jarodsky received their lump-sum benefits in October of 2000, no ERISA provisions or rules dealt expressly with a cash balance plan.[3] "A cash balance plan is a relatively new form of plan intended to combine attributes of both defined contribution and defined benefit plans." Hirt, 533 F.3d at 105. It is typically designed to pay out a lump-sum that accrues in

---

[2]By contrast, a "defined contribution plan" or "individual account plan" provides an individually invested account for each participant to which both the employee and the employer contribute. 29 U.S.C. § 1002(34). The employee bears the risk of investment performance in an individual account plan. Hirt v. Equitable Ret. Plan for Employees, Managers & Agents, 533 F.3d 102, 105 (2d Cir. 2008).

[3]The Pension Protection Act of 2006, Pub. L. No. 109-280, 120 Stat. 780 (2006), amended ERISA to specifically allow for cash balance defined benefit plans and created special rules for them. See Hirt, 533 F.3d at 104; West v. AK Steel Corp., 484 F.3d 395, 401-02 (6th Cir. 2007), cert. denied, 129 S. Ct. 895 (2009).

a hypothetical account[4] from a combination of (1) "the employer's hypothetical contribution," generally expressed as annual employment-based credits valued by the employee's salary and years of service, and (2) "hypothetical earnings" or interest credits based on a rate specified in the plan and generally guaranteed at either a fixed or variable rate linked to an index such as a Treasury bill rate. Id. (internal marks omitted); see also Register v. PNC Fin. Servs. Group, Inc., 477 F.3d 56, 62 (3d Cir. 2007); Campbell v. BankBoston, N.A., 327 F.3d 1, 4 (1st Cir. 2003). Cash balance plans "create a benefit structure that simulates that of defined contribution plans" because the employer makes contributions for recordkeeping purposes, but the employer does not deposit funds into an actual individual account, and the employer continues to bear the market risks by guaranteeing specific earning credits and a specified level of interest. Hirt, 533 F.3d at 105; Campbell, 327 F.3d at 4. Because a cash balance plan is not an individually invested account, and no ERISA rules explicitly governed cash balance plans at the relevant time, the cash balance plan was by default a "defined benefit plan" subject to compliance with the ERISA rules governing defined benefit plans. Hurlic v. S. Cal. Gas Co., 539 F.3d 1024, 1029 (9th Cir. 2008) ("[c]ash balance plans . . . are defined benefit plans.").

The notice sent to Sunder and Jarodsky stated that depending on various factors, the change to a cash balance system could result in future benefits being earned at a rate that is greater than, the same as, or less than what they would have earned if they had continued to accrue benefits under the Mercantile plan.[5] The new Cash Balance

---

[4]Sunder and Jarodsky state that nothing in the plan communicated the fact that the cash balance was hypothetical, but section 2.1(j) of the Cash Balance Plan explicitly states that "'Cash Balance Account' means a notional account." (Appellant's Add. at 73.)

[5]The notice of amendment was given pursuant to a prior version of the statute, which has since been amended to require a more detailed statement and more advanced notice. See 29 U.S.C. § 1054(h) (2006). The adequacy of the notice is not at issue in this appeal.

Plan would begin with an opening balance that would "include the value of the benefits you earned under the old plan." (J.A. at 447.) Participants were informed that each year, the cash balance would increase by a company-provided credit equal to a given percentage of the employee's pay and an interest credit. Consistent with Section 204(g) of ERISA, which prohibits plan amendments that decrease an accrued benefit, 29 U.S.C. § 1054(g), the notice promised that the total benefit earned under the Mercantile Plan through December 31, 1998, was guaranteed–"your opening balance will be at least as much as the value of your benefit earned under the old plan." (J.A. at 447.) Additionally, the notice promised that certain early retirement subsidies would be included in the opening cash balance for employees age 55 through age 64, and additional transition credits would be added to the opening balance for employees age 45 to 54. (Id.) The Cash Balance Plan provided participants the advantage of knowing how much they had accumulated toward retirement at any given time and permitted participants to elect to take their cash balance upon retirement as a lump sum or an equivalent monthly annuity.

Sunder and Jarodsky both elected to retire prior to reaching normal retirement age, and both elected to receive their benefit in a lump sum. When a plan participant opts to cash out a cash balance account before reaching the normal retirement age, as in this case, ERISA requires that the lump-sum payment "must be the actuarial equivalent of the normal accrued pension benefit." West, 484 F.3d at 400. At the time Sunder and Jarodsky retired, which was before the enactment of the Pension Protection Act of 2006, determining the actuarial equivalent, or present value, of the benefit was a two-step process called a "whipsaw" calculation, requiring the plan administrator to (1) project the hypothetical account balance forward to age 65 using the rate of future interest credits that would have accrued under the plan if the participant had remained in the plan to that time, and (2) discount that amount back to its present value on the date of the actual distribution using the Internal Revenue Code (IRC) statutory discount rate, which is tied to the 30-year Treasury bond, 26 U.S.C. § 417(e)(3)(A)(i)&(ii). West, 484 F.3d at 400. This prevented an

impermissible forfeiture of ERISA benefits that might otherwise occur: "If the plan's projection rate exceeds the statutory discount rate, then the present value of the accrued benefit will exceed the participant's [cash] account balance[,]" and the highest figure between the whipsaw calculation and the cash balance must be paid.[6] Esden v. Bank of Boston, 229 F.3d 154, 159 (2d Cir. 2000), cert. dismissed, 531 U.S. 1061 (2001).

The Cash Balance Plan required USBPP to determine the actuarial present value of the participants' retirement benefits through a whipsaw calculation but also provided that the participant would receive the greatest of three separate calculations: (1) the amount accrued under the Mercantile Plan as of December 31, 1998, using the IRC § 417(e)(3) discount rate, (2) the cash balance in the account, or (3) the actuarial equivalent of the cash balance (the whipsaw calculation). USBPP compared these three calculations and paid Sunder and Jarodsky the highest of the three, which in each case was the final cash balance in their accounts. Sunder received $493,081.19, and Jarodsky received $378,813.03. Sunder and Jarodsky questioned the accuracy of these amounts after discovering that the IRC § 417(e)(3) discount rate had not been used to calculate their opening cash balances. Instead, the Cash Balance Plan terms had required the opening cash balance to be set using a higher 8% discount rate prescribed in its Appendix A. (The statutory rate at the time was just over 6%.) Sunder and Jarodsky knew that using a lower discount rate would have produced a larger opening balance and, consequently, a higher ending cash balance.

Sunder and Jarodsky brought suit against USBPP, alleging that the use of the higher discount rate to set their opening cash balances was contrary to ERISA because

_____

[6]The new rules in the Pension Protection Act now, in part, allow a plan to deem the present value of an accrued benefit equal to the cash balance of a participant's hypothetical account without violating ERISA, thus eliminating the whipsaw calculation, but the new rules only apply to distributions made after August 17, 2006. West, 484 F.3d at 401-02 (discussing § 701(a)(2) of the Pension Protection Act).

it divested them of vested rights in the Mercantile Plan, see 29 U.S.C. § 1054(g), and resulted in a decreased lump-sum at payout. They also claimed that cash balance systems in general violate ERISA's anti-age discrimination provision, arguing that the benefits provided under such a plan accrue at a rate that is reduced on account of age. See 29 U.S.C. § 1054(b)(1)(H)(i).

The district court initially granted summary judgment to USBPP, except on the issue of whether the proper interest rate was used in calculating the lump-sum distribution. The district court concluded that the 8% discount rate of Appendix A used to determine the opening cash balance was not unreasonably high and did not violate ERISA. Specifically, the district court held that ERISA does not prescribe a discount rate for determining the present value of an opening cash balance and that ERISA only prevents a plan amendment from decreasing accrued benefits, not future benefits. The district court also rejected their assertion that the cash balance system varies the rate of benefit accrual on the basis of age.

At the bench trial on the remaining issue of whether the proper interest rate was used in calculating their lump-sum distributions, Eric Tepen, the plan administrator, first testified about how he calculated the opening balances. He said that he used the 8% discount rate and the actuarial assumptions provided in Appendix A and then added additional retirement subsidies in arriving at each participant's opening cash balance. Tepen testified that Sunder's and Jarodsky's opening cash balances were higher than the actuarial equivalent of their accrued Mercantile Plan benefit as of December 31, 1998, calculated using the IRC § 417(e)(3) discount rate.[7] Tepen then testified that to determine the lump-sum distributions due to Sunder and Jarodsky at

_____

[7]Sunder's opening cash balance was $394,135.31 (J.A. at 435), but his accrued benefit under the Mercantile Plan as of December 31, 1998, using the IRC statutory discount rate, was the lesser amount of $317, 635.19 (id. 154). Jarodsky's opening cash balance was $296,789.39 (id. at 456), while his accrued benefit under the Mercantile Plan, using the IRC rate, was only $261,405 (id. at 160).

the time of their early retirement, the Cash Balance Plan required him to compare and pay the largest of three different computations: (1) the cash balance at the time of retirement, (2) the value of the accrued benefits under the Mercantile Plan as of December 31, 1998, using the IRC discount rate, and (3) the "whipsaw" calculation, rolling the cash balance forward to the normal retirement age of 65 and then discounting it back to today's dollars using the IRC rate as prescribed in § 417(e)(3). (J.A. at 141-42.) Tepen testified that Sunder's accrued benefit under the Mercantile Plan was $317,635.19 (id. at 154), the whipsaw calculation yielded $450,389.63 (id. at 157); and the final cash balance of $493,081.10, the largest of the three calculations, was paid to Sunder (id. at 157). Tepen testified that Jarodsky's accrued benefit under the Mercantile Plan was $261,405 (id. at 160), his whipsaw calculation yielded $350,732 (id. at 161), and the final cash balance, the amount Jarodsky received, was the greater amount of $378,813 (id.).

A consulting actuarial expert, Lawrence Sher, prepared a report discussing cash balance plans in general as well as the formula used in this case for setting the opening balance. He stated that most commonly, an opening balance is set by determining the present lump-sum value of the individual's accrued benefit under the prior plan at the date of conversion, but "how that present value is determined varies significantly among employers." (Id. at 177.) In his experience, a rate close to the 30-year Treasury bond rate (which was near 6% in 1997) is most often used to determine the present value for purposes of setting the opening balance. He knew of no legal restrictions governing what discount rates a plan sponsor must use when establishing an opening cash balance. Sher explained that in this case, the actuarial assumptions provided in Appendix A were more favorable than is common in setting an opening balance and that "very generous" early retirement subsidies were included in the opening balance. (Id. at 181.) In his opinion, Sunder's and Jarodsky's opening balances would have been considerably less if calculated under the more commonly used assumptions. (Id. at 181-85.)

Because it became clear at the bench trial that USBPP had used the correct IRC statutory discount rate to calculate the final distributions, Sunder and Jarodsky urged the district court to revisit the summary judgment conclusion that using the 8% discount rate of Appendix A to calculate the opening balances did not violate ERISA. Sunder and Jarodsky presented evidence that their final lump-sum distribution would have been greater if USBPP had used the IRC § 417(e)(3) discount rate in the opening balance calculation. The district court agreed to revisit the opening balance issue and reversed its summary judgment ruling. The court concluded that the use of the higher discount rate decreased accrued benefits in violation of ERISA and the terms of the plan. The district court denied USBPP's motion to amend the judgment and ultimately ordered USBPP to pay damages in the amount of $69,769.57 plus prejudgment interest to Sunder, and $50,353.89 plus prejudgment interest to Jarodsky.

On appeal, USBPP argues that the district court erred in finding an ERISA violation in its calculation of the opening cash balances. Sunder and Jarodsky cross appeal, challenging the district court's determination of the date of the plan conversion, the corresponding determination of which statutory discount rate applied, and the denial of their ERISA age discrimination claims.

## II.
## A.

The main issue in this appeal is whether USBPP was required to apply the IRC § 417(e)(3) discount rate in calculating the opening cash balances in order to prevent a decrease of accrued benefits in the Mercantile Plan, in violation of ERISA, 29 U.S.C. § 1054(g), or the plan terms. The district court determined, and it is not disputed on appeal, that USBPP properly calculated the final lump-sum distributions using the IRC § 417(e)(3) discount rate. However, if the opening cash balances were improperly calculated, as the district court concluded, then that miscalculation necessarily affected the calculation of Sunder's and Jarodsky's final lump-sum

distribution. For the reasons that follow, we conclude that neither ERISA nor the terms of the plan precluded USBPP from calculating the opening cash balances using the 8% discount rate of Appendix A.

We apply de novo review to issues involving the interpretation of ERISA. Calhoon v. Trans World Airlines, Inc., 400 F.3d 593, 596 (8th Cir. 2005). Section 204(g) of ERISA provides that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan." 29 U.S.C. § 1054(g). As the district court noted in its summary judgment ruling, ERISA does not prohibit modifying or eliminating expected future benefits. See Campbell, 327 F.3d at 8 ("Benefits already earned under an old plan may not be taken away, but benefits expected but not yet accrued are not similarly protected." (internal citations omitted)). Thus, only the benefits accrued in the Mercantile Plan as of the date of the plan amendment (December 31, 1998) are protected from being decreased by the amendment.

Sunder and Jarodsky argue that in order to protect their accrued benefits, the opening cash balance should have been calculated using the IRC statutory discount rate, which would have yielded a higher opening balance and consequently a higher final payout. The district court's final ruling agreed with that reasoning, but we respectfully disagree because Section 204(g) protected only the benefits accrued under the Mercantile Plan as of December 31, 1998. The opening balance calculation included additional factors, such as early retirement subsidies and more favorable mortality tables, that were not part of the accrued benefits under the Mercantile Plan, so applying the IRC discount rate to that calculation not only would have prevented a decrease in accrued benefits but also would have given Sunder and Jarodsky a windfall that ERISA did not require. At the time of the plan conversion to a cash balance system in 1998, there was no ERISA provision governing the creation of an opening cash balance.[8] Absent such a provision, USBPP was free to set the opening

---

[8]The 2006 Pension Protection Act amended ERISA to require the benefit under the new plan to be no less than the sum of the accrued benefit determined under the

cash balance as it wished, as long as the calculation did not decrease already accrued benefits in the original plan. Because the Cash Balance Plan preserved the amount of the accrued Mercantile Plan benefit as of December 31, 1998, by guaranteeing that a participant's final distribution in the Cash Balance Plan "shall not be less than" the accrued benefit in the Mercantile Plan (Appellant's Add. at 72), the plan conversion and opening balance in the new plan did not decrease accrued benefits, regardless of how the opening balance was calculated.

As additional support for our conclusion, we note that prior to the Pension Protection Act of 2006, courts had interpreted ERISA to permit a wear-away provision in which a plan amendment was allowed to freeze the accrued benefits and not permit any additional accumulation of benefits until the new cash balance exceeded the benefits under the old plan. See, e.g., Hurlic, 539 F.3d at 1035 (noting the plan "clearly could have" frozen "all participants' pre-conversion benefits on July 1, 1998," the date of the plan conversion); Campbell, 327 F.3d at 8 (holding that application of the wear-away provision resulted in no forfeiture "because no accrued benefits were reduced; only expected benefits were reduced"). In light of that precedent, a cash balance plan with a wear-away provision could have set an opening cash balance at zero and not permitted the accrual of new benefits until after the new hypothetical balance exceeded the previously accrued benefits. The Cash Balance Plan in this case did not include a wear-away provision. New benefits began accruing immediately and were added to an opening balance that was larger than the accrued benefits under the Mercantile Plan, but the fact that a total freeze on benefits was tolerated as consistent with ERISA prior to the 2006 Pension Protection Act bolsters our conclusion that

_____

terms of the old plan plus the accrued benefit after amendment as determined under the new plan. 29 U.S.C. § 1054(b)(5)(B)(iii) (2006). While this could be interpreted as influencing the opening balance calculation, this provision was not in effect in 2000.

ERISA did not govern the setting of opening cash balances, as long as a participant's previously accrued benefits were protected and not decreased.

Also consistent with this interpretation, USBPP points to a report of the United States General Accounting Office ("the GAO report") from September 2000, which states, "current federal law does not govern how plan sponsors set opening hypothetical account balances for cash balance plans, provided that a plan ensures that participants do not receive less than the present value of prior accrued benefits if they separate from the employer." (J.A. at 616.) This was satisfied here. USBPP calculated the present actuarial equivalent of the benefits accrued under the Mercantile Plan, using the IRC statutory rate of discount, and ensured that the lump sum payout to Sunder and Jarodsky was greater than that amount. ERISA required no more.

Sunder and Jarodsky assert that the IRC § 417(e)(3) discount rate must be used every time a benefit is reduced to a present value and that because the opening balance was based on the present value of their accrued benefits under the Mercantile Plan, the IRC required the use of the statutory rate. We respectfully disagree. The context of the statute demonstrates that § 417(e)(3) applies to distributions. Section 417(e)(3) is entitled, "Determination of present value," and it lies within a larger section entitled, "Restrictions on cash-outs." 26 U.S.C. § 417(e). Paragraphs (1) and (2) of § 417(e) specify when consent is required before a plan can make an immediate distribution based on the present value of the annuity, and paragraph (3) then prescribes the method for determining the present value "for purposes of paragraphs (1) and (2)." 26 U.S.C. § 417(e)(3)(A)(i). Paragraph (3) specifies that "the present value shall not be less than the present value calculated by using the applicable mortality table and the applicable interest rate." Id. It further describes the "applicable interest rate" as "the annual rate of interest on 30-year Treasury securities for the month before the date of distribution." Id. § 417(e)(3)(A)(ii)(II). The structure and language of this statute indicate that the statutorily prescribed rate must be applied to determine the present value of a benefit when a participant cashes out and receives a distribution.

-12-

The opening balance calculation did not determine the present value for purposes of making a distribution; it determined the starting point of a hypothetical account.

Sunder and Jarodsky also point to the language of the Treasury Regulation, which requires use of the statutory rate to determine "the present value of any accrued benefit <u>and</u> the amount . . . of any distribution . . . ." Treasury Regulation § 1.417(e)-1, 26 C.F.R. § 1.417(e)-1(d)(1) (emphasis added). They suggest this language indicates that the statutory rate applies either to a determination of a benefit's "present value" <u>or</u> to a determination of the amount for purposes of a distribution. In effect, Sunder and Jarodsky would treat the term "present value" as disjunctive and independent of "the amount of any distribution," whereas the actual language of the regulation is conjunctive in nature. Their interpretation of the regulation would impermissibly expand the reach of the statute, because § 417(e)(3) expressly applies only in the context of a distribution. We conclude that the opening balance calculation did not determine the present value of the accrued benefits under the Mercantile Plan for purposes of making a distribution, and therefore, neither the regulation nor the § 417(e)(3) discount rate applied. Consequently, use of the 8% discount rate of Appendix A did not violate ERISA or the IRC.

The district court also concluded that, even if ERISA did not require the opening cash balance to be calculated using the statutory discount rate, the terms of the plan did. When an ERISA plan grants the administrator discretion to construe the plan, as this one does, the court reviews the plan administrator's construction of the plan terms for an abuse of discretion, <u>Jessup v. Alcoa, Inc.</u>, 481 F.3d 1004, 1006 (8th Cir. 2007); and we review de novo the district court's application of that deferential abuse-of-discretion standard, <u>see</u> <u>Norris v. Citibank, N.A. Disability Plan (501)</u>, 308 F.3d 880, 884 (8th Cir. 2002).

The terms of the Cash Balance Plan provide that the opening balance credit is calculated using the discount rate and other actuarial assumptions as set forth in

-13-

Appendix A. Specifically, the opening balance credit is defined as the "actuarial equivalent" of the accrued benefit under the Mercantile Plan, and the Cash Balance Plan's definition of "actuarial equivalent" states, "[f]or purposes of determining the Opening Balance Credit . . . Actuarial Equivalent shall be based on the interest rate, mortality table and assumed retirement age specified in Appendix A." (Appellant's Add. at 73.) Consistent with this plan language, USBPP calculated the opening cash balances based upon the present value of the accrued benefit under the Mercantile Plan as of December 31, 1997,[9] using the discount rate and mortality assumptions of Appendix A, as well as the addition of early retirement subsidies that were not part of the participants' accrued benefits under the Mercantile Plan.

Sunder and Jarodsky relied on the notice to participants, which indicated that the opening balance would "include" and was guaranteed to be "at least as much as" their accrued benefits under the Mercantile Plan (J.A. at 447) and would be "based on the present value of the benefit you earned through December 31, 1997," (id. at 449). As already noted, the undisputed evidence shows that Sunder's and Jarodsky's opening balances, calculated using the 8% discount rate of Appendix A and extra factors, were in fact greater than the present actuarial value of their accrued benefits under the Mercantile Plan, calculated using the IRC statutory rate. Ante at 8, n.6. Sunder's opening balance was $394,135.31, and his separately calculated accrued benefit under the Mercantile Plan as of December 31, 1998, using the IRC § 417(e)(3) statutory discount rate, was the smaller amount of $317,635.19. Likewise, Jarodsky's opening cash balance was $296,789.39, and his accrued benefit under the Mercantile Plan, using the IRC § 417(e)(3) statutory discount rate, was the smaller amount of $261,405. USBPP did not abuse its discretion in interpreting the plan terms or in concluding that the opening cash balances complied with those terms and ERISA,

---

[9]The Cash Balance Plan hypothetical accounts actually began accruing benefits as of January 1, 1998, but the Cash Balance Plan protected the accrued benefits under the Mercantile Plan through December 31, 1998, because the notice was not effective until that time.

where the opening balances were greater than the accrued benefits under the Mercantile Plan.

Although Sunder and Jarodsky were generally correct in their assertion that using the IRC discount rate in the opening balance calculation would have increased the value of their opening balances, that type of increase was not required by ERISA because it was not necessary in order to protect the accrued benefits under the Mercantile Plan. The value of Sunder's and Jarodsky's accrued benefits under the Mercantile Plan was separately protected by an appropriate calculation (using the statutory discount rate) at the time of their lump-sum early retirement distributions, and USBPP's decision to follow the plan terms instead of using the statutory discount rate to calculate the opening cash balances did not decrease any accrued benefits. Thus, we conclude that Sunder and Jarodsky were not entitled to damages.

B.

Sunder and Jarodsky brought a cross appeal, asserting that the district court erred in setting the date of the plan conversion, which in turn affected the amount of the statutory interest rate due on their award of damages. Because our conclusion above requires reversal of the award of damages, this issue is moot.

Their cross appeal also challenged the district court's dismissal of their ERISA age discrimination claim. ERISA prohibits reducing the rate of benefit accrual "because of the attainment of any age." 29 U.S.C. § 1054(b)(1)(H)(i). Sunder and Jarodsky argue for the first time on appeal that the Cash Balance Plan discriminated on the basis of age because there was an age-based disparity in the discount rates used to calculate the participants' opening cash balances. They had argued to the district court that a participant's age plays a role in converting a final cash balance into an age 65 annuity. They had also argued that an older employee in this system will have fewer years in which to collect interest on a cash account than a younger employee,

and that consequently, the older employee's annuity will be less than that of a younger employee. Sunder and Jarodsky have raised a completely new ERISA age discrimination argument on appeal. Their argument is therefore waived, and we see no miscarriage of justice to warrant further analysis. See id.

### III.

Accordingly, we reverse the district court's judgment awarding damages to Sunder and Jarodsky, and we affirm the district court's dismissal of their ERISA age discrimination claim.

_____